2015-1700

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### BRAINTREE LABORATORIES, INC.

*Plaintiff-Appellee*

v.

### NOVEL LABORATORIES, INC.

*Defendant-Appellant*

**Appeal from the United States District Court for the District of New Jersey in**
***Braintree Laboratories, Inc. v. Novel Laboratories, Inc.*,**
**3-11-cv-01341-PGS-LHG**

## PRINCIPAL BRIEF FOR APPELLANT NOVEL LABORATORIES, INC.

H. Keeto Sabharwal
Byron L. Pickard
Nirav N. Desai
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600

Ronald M. Daignault
POLSINELLI PC
900 Third Avenue, Suite 2100
New York, NY 10022
212.803.9907

Ronald J. Schutz
Matthew B. McFarlane
Oren D. Langer
ROBINS KAPLAN LLP
601 Lexington Avenue, Suite 3400
New York, NY 10022
212.980.7400

*Counsel for Defendant-Appellant Novel Laboratories, Inc.*

Dated: September 9, 2015

# CERTIFICATE OF INTEREST

Counsel for the Appellant <u>H. Keeto Sabharwal</u> certifies the following:

1.      The full name of every party or amicus represented by me is:
Novel Laboratories, Inc.

2.      The name of the real party in interest represented by me is:
Novel Laboratories, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:
None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C: H. Keeto Sabharwal, Byron L. Pickard, and Nirav N. Desai

ROBINS KAPLAN LLP: Ronald J. Schutz, Matthew B. McFarlane, Ph.D., David Leichtman, Stacie E. Oberts, Oren D. Langer, and Jonathan J. Marcus

POLSINELLI P.C.: Ronald M. Daignault

PARNESS LAW FIRM, PLLC: Hillel I. Parness


Dated: September 9, 2015          /s/ H. Keeto Sabharwal
                                  Sterne, Kessler, Goldstein & Fox, PLLC
                                  1100 New York Avenue, N.W.
                                  Washington, D.C. 20005
                                  202.371.2600
                                  202.371.2540
                                  keetos@skgf.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................... i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES ..........................................................v

RULE 47.5 STATEMENT OF RELATED CASES ...............................1

STATEMENT OF APPELLATE JURISDICTION ..................................2

PRELIMINARY STATEMENT ........................................................2

STATEMENT OF THE ISSUES........................................................4

Non-infringement Issues...............................................................4

Invalidity Issues Raised by the District Court's Infringement Analysis ..................6

STATEMENT OF THE CASE..........................................................6

STATEMENT OF FACTS ...............................................................8

I.     The '149 patent claims colonic-purgation-inducing solutions that do not produce outside-of-normal-range blood-chemistry alterations or untoward effects in a patient population...........................................................9

II.    In a prior appeal, this Court reversed the trial court's construction of "clinically significant electrolyte shift" and "a patient" and vacated a summary judgment of infringement. ............................................10

A.     The trial court's summary-judgment ruling. ...................................10

B.     This Court reversed the trial court's constructions of "a patient" and "clinically significant electrolyte shifts," requiring that the claimed compositions produce neither untoward effects nor abnormal blood-chemistry alterations in a patient population.................................10

C.     This Court vacated the summary judgment of infringement and remanded for further factual findings whether infringement exists under the new claim constructions. ....................................................................11

III.   On remand, Braintree offered no evidence concerning what percentage of patients experienced untoward effects or blood-chemistry shifts outside the normal range after taking Novel's ANDA product. ......................................13

A.     Braintree offered only a single conclusory testimonial statement that SUPREP does not produce untoward effects, but the trial court found that testimony was not credible. ...........................................................14

B.    Braintree's only evidence of blood-chemistry alterations was an analysis of the average patient response after taking SUPREP. ..................................... 16

IV.   The trial court finds Novel infringes without deciding whether Novel's ANDA Product would cause untoward effects and by using a mean-response approach. ................................................................................................ 21

SUMMARY OF ARGUMENT ............................................................ 23

STANDARDS OF REVIEW ................................................................ 27

ARGUMENT ...................................................................................... 28

I.     This Court should reverse because the trial court reached its conclusion of infringement without deciding whether SUPREP causes "other untoward effects." .......................................................................................... 29

A.    The trial court erred by failing to decide whether SUPREP caused untoward effects. ....................................................................................... 29

B.    The proper remedy for the trial court's error in failing to decide the untoward-effect question is reversal, not remand, because the trial court has already discredited Braintree's evidence on the question. ............................ 30

C.    The evidence of record shows that SUPREP produces untoward effects in a patient population. ........................................................................ 31

II.    The trial court did not properly apply this Court's claim construction in deciding SUPREP did not produce blood-chemistry alterations outside the normal range; the Court should reverse the infringement judgment. ............ 33

A.    This Court has already construed the '149 patent to require a percentage-patient approach in judging whether SUPREP would produce a clinically significant electrolyte shift in a patient population. ...................................... 34

B.    The trial court erred because it applied a means approach, not the mandated percentage approach, and arrived at an equally absurd result this Court's construction attempted to avoid. .................................................... 35

C.    This Court should reverse the trial court's finding of infringement because Braintree did not introduce any evidence showing that SUPREP does not produce blood-chemistry alterations outside normal range for any percentage of patients. ..................................................................................... 38

III.   The trial court did not consider invalidity under 35 U.S.C. § 112. .............. 40

A.    The trial court's use of a means-based analysis instead of using patient percentages renders the claims indefinite under Teva. .................................. 41

B.    At the time of the invention, the patentees were not in possession of a composition that—based on mean data—did not produce any clinically significant electrolyte shifts. .......................................................................43

CONCLUSION AND RELIEF SOUGHT ..............................................................46

# TABLE OF AUTHORITIES

## Cases

*AFG Indus., Inc. v. Cardinal IG Co., Inc.*,
  375 F.3d 1367 (Fed. Cir. 2004) ........................................................27

*Alcon Research Ltd. v. Barr Labs., Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014) ........................................................27

*Alza Corp. v. Mylan Labs., Inc.*,
  464 F.3d 1286 (Fed. Cir. 2006) ........................................................27

*ArcelorMittal France v. AK Steel Corp.*,
  786 F.3d 885 (Fed. Cir. 2015) .........................................................28

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) ...................................................28, 43

*Banks v. United States*,
  741 F.3d 1268 (Fed. Cir. 2014) ........................................................28

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
  749 F.3d 1349 (Fed. Cir. 2014) ...................................................*passim*

*Florida Power & Light Co. v. United States*,
  103 Fed. App'x 669 (Fed. Cir. 2004) ..................................................35

*Hormel v. Helvering*,
  312 U.S. 552 (1941)....................................................................40

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) ........................................................41

*Laitram Corp. v. NEC Corp.*,
  115 F.3d 947 (Fed. Cir. 1997) .........................................................27

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014).................................................................41

*PIN/NIP, Inc. v. Platte Chem. Co.*,
  304 F.3d 1235 (Fed. Cir. 2002) ........................................................44

*Pozen Inc. v. Par Pharm., Inc.*,
  696 F.3d 1151 (Fed. Cir. 2012) ..........................................................27

*Raytheon Co. v. Roper Corp.*,
  724 F.2d 951 (Fed. Cir. 1983) ............................................................27

*Regents of the Univ. of Cal. v. Eli Lilly & Co.*,
  119 F.3d 1559 (Fed. Cir. 1997) ..........................................................44

*Reiffin v. Microsoft Corp.*,
  214 F.3d 1342 (Fed. Cir. 2000) ..........................................................43

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  757 F.3d 1366 (Fed. Cir. 2014) ..........................................................27

*Univ. of Rochester v. G.D. Searle & Co., Inc.*,
  358 F.3d 916 (Fed. Cir. 2004) ............................................................44

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  789 F.3d 1335 (Fed. Cir. June 18, 2015)....................................*passim*

*Vas-Cath Inc. v. Mahurkar*,
  935 F.2d 1555 (Fed. Cir. 1991) ..........................................................43

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ............................................................4

**Statutes**

28 U.S.C. § 1295(a)(1)............................................................................2

28 U.S.C. § 2107(a) ...............................................................................2

28 U.S.C. § 1331......................................................................................2

28 U.S.C. § 1338(a) ................................................................................2

35 U.S.C. § 112........................................................................................4

35 U.S.C. § 112, ¶ 1.................................................................26, 40, 42

35 U.S.C. § 112, ¶ 2.......................................................................26, 40

## RULE 47.5 STATEMENT OF RELATED CASES

This case was previously before this Court in the appeal captioned *Braintree Laboratories, Inc. v. Novel Laboratories, Inc.*, Case No. 2013-1438. The decision in that appeal issued on April 22, 2014, from a panel consisting of Judges Dyk, Prost, and Moore, and is reported at 749 F.3d 1349 (Fed. Cir. 2014).

The Court's decision in this appeal may directly affect the following district court cases:

- *Braintree Laboratories, Inc. v. Breckenridge Pharmaceutical, Inc.*, 1:12-cv-06851-AJN (S.D.N.Y.);

- *Braintree Laboratories, Inc. v. Taro Pharmaceuticals USA, Inc.*, 1:14-cv-08147-AJN (S.D.N.Y.); and

- *Braintree Laboratories, Inc. v. Gator Pharmaceuticals, Inc.*, 3:13-cv-00389-TJC-MCR (M.D. Fla.).

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1). The trial court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a) and entered final judgment on June 2, 2015. Novel filed a notice of appeal on June 2, 2015. On June 25, 2015, the trial court entered the Final Order of Amended Judgment, and Novel filed an amended notice of appeal on June 26, 2015. This appeal is therefore timely. 28 U.S.C. § 2107(a); Fed. R. App. P. 4.

## PRELIMINARY STATEMENT

The trial court erred in finding that Novel infringed independent claims 15 and 18, and dependent claims 19, 20, and 23, of U.S. Patent No. 6,946,149 ("the '149 patent"), which claims bowel-cleansing compositions and methods that do not produce "clinically significant electrolyte shifts."

The trial court did not follow this Court's instructions from the prior appeal, *i.e.*, rehear the case to decide whether the accused product would avoid "producing any clinically significant electrolyte shifts in a patient population," when the term "clinically significant electrolyte shifts" is properly construed as "alterations in blood chemistry that are outside the normal upper or lower limits of their normal range *or other untoward effects*." *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) (emphasis added). In fact, the trial court never ruled on whether the accused product would produce "untoward effects." This was

2

error, and the remedy should be reversal, not remand, because the trial court found that Braintree failed to introduce any credible testimony to support a finding that no "untoward effects" occurred, and it therefore failed to meet its burden to establish infringement.

The trial court also failed to follow this Court's additional directive (as made clear in all three of the panel members' opinions) to decide whether the accused product would produce "any alterations in blood chemistry that are outside the normal upper or lower limits of their normal range" in a patient population. This Court's opinion makes clear that such a determination requires a *percentage*-based analysis—that is, the trial court had to decide the issue by assessing what percentage of patients experienced an abnormal shift. Instead, the trial court adopted Braintree's expert's "means" or average-based approach to analyze the data, which Braintree's expert conceded can mask the frequency with which patients have out-of-range shifts. This too was error. And the proper remedy is reversal because Braintree did not introduce any evidence showing that a large percentage of patients do not experience abnormal blood-chemistry alterations after taking SUPREP.

Finally, the trial court's decision to adopt the foregoing average-based approach for assessing clinically significant electrolyte shifts created new issues

under 35 U.S.C. § 112.[1] Assuming for the sake of argument the trial court was correct that a means approach was one of the available ways to determine infringement, then the patent's claims are indefinite and lack an adequate written description, particularly in view of the this Court's decision in *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. June 18, 2015), which issued after the original notice of appeal was filed in this case.

This Court should reverse.

## STATEMENT OF THE ISSUES

**Non-infringement Issues**

1.     In the prior appeal, this Court held that, to prove infringement, Braintree had to demonstrate that the accused solution produced *neither*: (i) "alterations in blood chemistry that are outside the normal upper or lower limits of their normal range," *nor* (ii) "other untoward effects." The trial court found that Braintree's evidence of untoward effects was not credible. The trial court nevertheless ruled that Novel infringed, but did not decide whether Novel's ANDA product would produce untoward effects.

---

[1] 35 U.S.C. § 112 was amended by the America Invents Act, Pub. L. No. 112-29 ("AIA"), which took effect on September 16, 2012. Because the application resulting in the '149 patent was filed before that date, the pre-AIA statute applies to this proceeding. *See e.g. Williamson v. Citrix Online*, LLC, 792 F.3d 1339, 1343 n.2 (Fed. Cir. 2015).

4

Did the trial court err, as a matter of law, by finding infringement (i) without deciding whether the allegedly infringing product actually did avoid "other untoward effects"; and (ii) in the absence of any credible evidence showing untoward effects would not be produced?

2.    In the prior appeal, the panel majority construed the '149 patent's claim term "a patient" to mean "the general class of persons to whom the patented compositions are directed" to avoid the "absurd result of infringement even if a composition causes clinically significant electrolyte shifts in a large percentage of patients." All three panelists' decisions (one concurring, one dissenting) in the prior appeal recognized that this construction required determining the *percentage of patients* within the patient population who suffered clinically significant electrolyte shifts. On remand, the trial court decided the issue of whether defendants infringe by using the *average* electrolyte shifts of all patients, an approach that arrived at infringement even though *a large percentage of patients* in the presented studies had abnormal blood-chemistry alterations.

Did the trial court err, as a matter of law, by improperly applying this Court's prior claim construction in finding that Novel's ANDA product would infringe the '149 patent?

**Invalidity Issues Raised by the District Court's Infringement Analysis**

3.      If the Court finds that "alterations in blood chemistry that are outside the normal upper or lower limits of their normal range" in "the general class of persons to whom the patented compositions are directed" can be determined by considering mean electrolyte levels for a patient population, are the claims rendered indefinite under *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. June 18, 2015)?

4.      If the Court finds that "alterations in blood chemistry that are outside the normal upper or lower limits of their normal range" in "the general class of persons to whom the patented compositions are directed" can be determined by considering mean electrolyte levels for a patient population, does the patent describe a claimed solution that would produce no blood-chemistry alterations in a patient population as measured by a means approach (*i.e.*, arithmetic averages)?

## STATEMENT OF THE CASE

The '149 patent claims bowel-cleansing compositions and methods "for inducing purgation of the colon of a patient" that do "not produce any clinically significant electrolyte shifts." On March 9, 2011, Braintree sued Novel in the United States District Court for the District of New Jersey for infringement of the Orange Book-listed '149 patent.

6

On January 13, 2013, the trial court granted Braintree summary judgment that Novel infringed claims 15, 16, 18-20, and 23, and denied Novel's summary-judgment motion for non-infringement. Novel appealed. In its April 22, 2014 decision, this Court uniformly agreed that the trial court applied the wrong claim construction for "clinically significant electrolyte shifts," and the panel majority further held the trial court applied the wrong claim construction for "a patient." *Braintree Labs.*, 749 F.3d at 1356-57. These limitations were correctly construed to mean that the claimed composition did not produce "alterations in blood chemistry that are outside the normal upper or lower limits or other untoward effects" in "the general class of persons to whom the patented compositions are directed, *i.e.*, a patient population." *Id*. The Court's construction avoided "the absurd result of infringement even if a composition causes clinically significant electrolyte shifts in a large percentage of patients." *Id.* While Judge Dyk would have found non-infringement as a matter of law, because, for example, some of the clinical trial's data was "sufficient to show that the claim limitation was not met" because a "majority of patients experienced clinically significant electrolyte shifts," *id.* at 1360 n.1, the Court remanded the case for determination of whether the accused infringing product causes "'clinically significant electrolyte shifts' in accordance with the proper claim construction articulated here within." *Id*. at 1357.

On remand, the trial court held a three-day hearing, finding infringement and entering a final order of judgment on June 1, 2015. That judgment was amended on June 25, 2015 to provide for certain injunctive relief. This appeal follows.

## STATEMENT OF FACTS

In 2010, Novel, a generic-pharmaceutical-drug company, filed an Abbreviated New Drug Application with the FDA, seeking approval to market a generic equivalent of SUPREP—a bowel-prep solution for pre-colonoscopy colon cleansing. Following Novel's ANDA filing, Braintree sued Novel, alleging that Novel's ANDA product would infringe the Orange Book-listed '149 patent.[2]

The trial court initially entered summary judgment that Novel's ANDA product would infringe the '149 patent and, after a bench trial, ruled that the asserted claims of the '149 patent were not invalid. On appeal, this Court affirmed the trial court's findings of no invalidity but reversed the trial court's claim construction of "clinically significant electrolyte shifts" and also vacated its summary judgment of infringement, remanding the case for a determination of "whether SUPREP avoids producing any clinically significant electrolyte shifts in a patient population." *Braintree Labs.*,749 F.3d at 1357. The Court construed the

---

[2] Because Novel's ANDA product was a copy of SUPREP, Braintree tried this issue by considering the clinical trial data for Braintree's SUPREP product. That is, if SUPREP infringed, so would Novel's ANDA product. Accordingly, references are made herein and in the record to both SUPREP and Novel's ANDA product.

clinically significant electrolyte shifts limitation to require Braintree to prove that

Novel's ANDA product would produce *neither* (i) "untoward effects," *nor* (ii)

"alterations in blood chemistry that are outside the normal upper or lower limits of

their normal range" in a patient population. *Id.* at 1356.

## I.     The '149 patent claims colonic-purgation-inducing solutions that do not produce outside-of-normal-range blood-chemistry alterations or untoward effects in a patient population.

The '149 patent generally is directed to "low-volume, hyper-osmotic

solutions consisting of sulfate salts…useful for the cleansing of the bowel and, in

lower volumes, as a laxative, without producing clinically significant changes in

bodily function." (A00000051, Abstract.)

The '149 patent's representative claim 15 (as reexamined) recites:

A composition for inducing purgation of the colon of a patient, the composition comprising from about 100 ml to about 500 ml of an aqueous hypertonic solution comprising an effective amount of $Na_2SO_4$, an effective amount of $MgSO_4$, and an effective amount of $K_2SO_4$, wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.

(A00000058-A00000059.)

The '149 patent defines the claimed clinically significant electrolyte shifts as

"alterations in blood chemistry that are outside the normal upper or lower limits of

their normal range or other untoward effects." (A00000053, 2:46-51.)

9

**II.    In a prior appeal, this Court reversed the trial court's construction of "clinically significant electrolyte shift" and "a patient" and vacated a summary judgment of infringement.**

**A.    The trial court's summary-judgment ruling.**

The trial court initially decided by summary judgment that Novel infringed claims 15, 18, 19, 20, and 23 of the '149 patent. Though Novel did not have the burden of proof, the trial court ruled that Novel had failed to produce sufficient evidence showing that its ANDA product would not produce the claimed "clinically significant electrolyte shifts." The trial court's decision relied on (1) its construction of that claim phrase as only requiring Braintree to show that Novel's ANDA product would not produce "alterations in blood chemistry that are both outside the normal upper or lower limits of their range *and* accompanied by or manifested as other untoward effects," and (2) its importation of the claim term "a patient" from the preamble into the "clinically significant electrolyte shifts" term and construction of that term to mean "one or more patients." *Braintree Labs*., 749 F.3d at 1355-57 (emphasis in the original).

**B.    This Court reversed the trial court's constructions of "a patient" and "clinically significant electrolyte shifts," requiring that the claimed compositions produce neither untoward effects nor abnormal blood-chemistry alterations in a patient population.**

On appeal, this Court rejected the trial court's conjunctive construction of "clinically significant electrolyte shifts" and reversed, holding that the claim limitation means "alterations in blood chemistry that are outside the normal upper

or lower limits of their normal range *or* other untoward effects." *Id.* at 1356
(emphasis added).

The Court then reversed the construction of "a patient." Braintree argued "a
patient" should mean one or more patients, "as it cannot be the case that no
infringement can occur if SUPREP causes a clinically significant electrolyte shift
in a single patient." *Id.* at 1357.  Novel countered that Braintree's and the trial
court's construction improperly "limits the utility of the claimed compositions to
administration in a single patient" which would "allow a composition to meet the
claims even if 99 patients out of 100 experienced clinically significant electrolyte
shifts, as long as one patient did not." *Id*. This Court agreed with Novel, stating
that the construction of "a patient" as "one or more patients" "leads to the absurd
result of infringement even if a composition causes clinically significant electrolyte
shifts in a large percentage of patients." *Id.*

The Court instead construed "a patient" to mean "the general class of
persons to whom the patented composition are directed, *i.e.*, a patient population."
*Id.*

**C.    This Court vacated the summary judgment of infringement and
remanded for further factual findings whether infringement exists
under the new claim constructions.**

Because the summary-judgment record included evidence showing that at
least some patients had alterations in blood chemistry outside the normal range, the

Court vacated the summary judgment of infringement and remanded "for further factual findings to determine whether the composition covered by Novel's ANDA product infringes under the new claim construction articulated herein." *Id.* at 1352.

All three opinions in the divided panel reflected a common understanding that the Court's claim constructions were to be applied by examining the evidence of the relative number of patients experiencing electrolyte shifts or untoward effects. The Court's opinion first rejected the trial court's construction of "a patient" because it would lead "to the absurd result of infringement even if a composition causes clinically significant electrolyte shifts *in a large percentage of patients*." *Id.* at 1357 (emphasis added).

Judge Dyk concurred, joining the remand, but stated his view that "it seems to me that Novel established non-infringement as a matter of law under the correct 'clinically significant electrolyte shifts' construction." *Id.* at 1360. In a footnote to his statement, Judge Dyk explained: "The sole evidence in the summary judgment record concerning the *percentage of individuals* experiencing such electrolyte shifts is data from two clinical studies of SUPREP, and those data are sufficient to show that the claim limitation was not met." *Id.* at 1360 n.1 (emphasis added). He added that one study showed "that a majority of patients experienced clinically significant electrolyte shifts," while the other "showed that a significant minority" experienced the same. *Id.* Judge Moore's dissent criticized the Court's opinion

12

because it presented practical difficulties in determining what percentage of
patients experiencing abnormal shifts in electrolytes would be needed to meet the
"a patient" limitation. *Id.* at 1367 n.3.

### III. On remand, Braintree offered no evidence concerning what percentage of patients experienced untoward effects or blood-chemistry shifts outside the normal range after taking Novel's ANDA product.

The trial court held a three-day remand trial to determine whether Novel's
ANDA product would produce clinically significant electrolyte shifts under the
correct claim constructions. That is, whether Novel's ANDA product would
produce "alterations in blood chemistry that are outside the normal upper or lower
limits of their normal range or other untoward effects" in a patient population. If it
would produce either effect, there is no infringement according to this Court's
mandate. Because Novel's ANDA product was a copy of SUPREP, Braintree tried
this issue by considering the clinical trial data for Braintree's SUPREP product.
That is, Braintree argued if SUPREP infringed, so would Novel's ANDA product.

On remand, Braintree's entire showing on the untoward-effects prong of the
infringement inquiry rested on a single conclusion of its expert witness: "I've seen
no evidence in the materials that I've reviewed that SUPREP is associated with
untoward effects." (A00027083.) The trial court later discredited this testimony.
(A00000013.)

13

Braintree's case instead focused on whether SUPREP caused outside-of-normal-range blood-chemistry alterations. On that issue, Braintree's expert witness, Dr. Heitjan, opined that SUPREP did not cause outside-of-normal-range blood-chemistry alterations because the *average* of all patients' electrolyte levels remained in the normal range after taking SUPREP. In simple terms, Dr. Heitjan analyzed patient data from four SUPREP clinical trials and calculated the average (*i.e.*, arithmetic mean) blood-electrolyte value for all patients in the trial *before* taking SUPREP. (A00000021.) Dr. Heitjan then calculated the average blood-electrolyte value of all patients *after* taking SUPREP. (A00000020-22.) Braintree did not offer evidence showing how many, or what percentage of patients, experienced a blood-chemistry alteration outside of the normal range. And Dr. Heitjan acknowledged that a mean value within the "normal" range is possible even if *all* patients experienced clinically significant electrolyte shifts. (A00026998-26999.)

## A.    Braintree offered only a single conclusory testimonial statement that SUPREP does not produce untoward effects, but the trial court found that testimony was not credible.

On the issue of whether SUPREP produces untoward effects, Braintree only offered a single conclusory sentence by Dr. Peura that SUPREP would not produce untoward effects: "I've seen no evidence in the materials that I've reviewed that SUPREP is associated with untoward effects." (A00027083.) But the trial court

14

discredited this testimony: "Dr. Peura admitted that he did not research the Med Watch[3] section of the FDA website, nor did he inquire of Braintree whether there were any adverse effect reports." (A00000012.) The trial court further found: "[b]ased on Dr. Peura's unfamiliarity with the Med Watch report and his failure to ask Braintree, his testimony regarding [untoward effects] is suspect. This broad statement of not being aware of any untoward effects of SUPREP on patients is incredulous since he did not perform any research." (A00000013.)

In contrast, Novel's unrebutted evidence of untoward effects showed patients who, after SUPREP administration, suffered from, "Abdominal distension, Dyspnea, Malaise, and *Sudden cardiac death*," (A00019865; A00027356-27357 (emphasis added)), "syncope, collapse, slurred speech, tremors, confusion," (A00019856; A00027354-28355), asystole (heart stoppage) for 13 seconds (A00019843; A00027357-27358), and hyponatremia (abnormally low sodium), causing a patient to lose consciousness for two days. (A00019857; A00027359-27360.) These are all untoward effects.

After reviewing reports of untoward effects described above on cross-examination, Dr. Peura conceded: "Somebody has concluded that SUPREP may have been responsible for these adverse events, and I have no reason to dispute that." (A00027358.)

---

[3] Med Watch collects adverse-event reports for FDA-approved drugs.

**B.    Braintree's only evidence of blood-chemistry alterations was an analysis of the average patient response after taking SUPREP.**

On the issue of whether SUPREP produced outside-of-normal-range blood-chemistry alterations, Braintree looked at patient data from four clinical trial studies for FDA approval of SUPREP. In these studies, patients had blood drawn at least once before taking SUPREP and at least once after administration. The studies recorded electrolyte serum levels measured for each of these blood draws.

Rather than looking at the individual patients within the study to determine what percentage of patients in these trials experienced a clinically significant electrolyte shift after taking SUPREP, Dr. Heitjan averaged together the serum level measurements for all patients before and after taking SUPREP and compared those averages to an established normal range of serum levels. (A00026923:25-A00026924:3.) Dr. Heitjan concluded that because the average level for all patients was within the normal range before taking SUPREP and the average level did not shift outside the normal range after taking SUPREP, there was no clinically significant electrolyte shift in the patient population. (A00026924:8-11.)

For a detailed understanding of Dr. Heitjan's methodology, consider the following example from the bench trial—SUPREP clinical trial BLI800-202 ("the 202 Study"). The 202 Study had 18 patients: six healthy; six with renal

16

impairment; and six with liver impairment.[4] (A00000008; A00026949:18-21.) All patients had three baseline blood draws before taking SUPREP—the first at a screening visit, the second on the day before taking SUPREP, and the third just before taking SUPREP. (A00026949:23-A00026950:2.) The patients took two bottles of SUPREP, twelve hours apart, with fourteen blood draws taken during and following SUPREP administration. (A00000008.) For each blood draw, serum levels for seven electrolytes were measured. (A00026947:1-6.)

For the third baseline blood draw and each of the fourteen blood draws taken during and following SUPREP administration, Dr. Heitjan calculated the mean value for all 18 patients for each electrolyte at each blood-draw interval. (A000000021.) For a given electrolyte at each blood draw, Heitjan totaled the measured electrolyte values for all 18 patients and divided that total by 18, the number of patients in the sample, to obtain a mean electrolyte level for the sample. (A00026928:17-A00026929:13.) Dr. Heitjan then compared these mean electrolyte levels to determine whether the mean electrolyte level taken at baseline prior to SUPREP administration—which was within the normal electrolyte level range— ever shifted to outside of the normal range in the subsequent fourteen blood draws

---

[4] The parties did not dispute, and the trial court found, that all of the subjects in the 202 Study are part of the "general class of persons to whom the patented composition are directed," *i.e.*, a "patient" as this Court has construed that claim term. (*See* A00000007, "Each study constituted of patients within the patient population.")

taken during and after SUPREP administration. Dr. Heitjan concluded that the mean electrolyte levels for the sample patient population did not shift from within the normal range to outside the normal range.[5] (*See* A00026974, Dr. Heitjan explaining his graphical analysis of the 202 Study.) Dr. Heitjan repeated this analysis for all electrolytes in all four studies, finding that the mean values for the patient population stayed in the normal range. (A00026964-26965 (BLI800-301); A00026966 (BLI800-302); A00026969-26970 (BLI800-303); A00026971-26972 (combined BLI800-301 through -303); A00026973; A00026976 (BLI800-202).) Dr. Heitjan then used the means from the four clinical trials to estimate the mean of the entire patient population, opining that the true patient population would on average not experience abnormal blood-chemistry alterations. (A00000026; A00026965:1-20.)

In rebuttal, Novel argued that Dr. Heitjan's means approach was inconsistent with this Court's claim construction because it once again allows a finding "of infringement even if a composition causes clinically significant electrolyte shifts in a large percentage of patients." *Braintree Labs.*, 749 F.3d at 1357. Indeed, at trial,

---

[5] Dr. Heitjan also calculated a 95% confidence interval for each electrolyte at each blood draw. The 95% confidence interval is a statistical measure indicating the range of values within which there is 95% certainty that the true population mean falls. (A00026926.) But because the means approach is not consistent with this Court's claim construction, the confidence interval does nothing to bolster Dr. Heitjan's analysis.

Dr. Heitjan conceded that, by looking only at mean data, one can mask individual patient data as well as the frequency by which individuals within a study group exhibited outside-of-normal range shifts. (A00027016:1-9.) A simplified example is illustrative: using the means approach, a patient who suffered an electrolyte shift from within the normal range to *above* the normal range could cancel out a patient who suffered a shift from within the normal range to *below* the normal range. (A00026999; A00027001.) Thus, although 100% (both patients) suffered electrolyte shifts from within the normal range to outside the normal range, the *mean* of the two-patient population could show no shift outside the normal range, giving the incorrect impression that no outside-of-normal shifts occurred in patients in the population. (*Id.*) And indeed, in the four clinical trials that Dr. Heitjan examined, even though, as discussed below, a large percentage of individual patients suffered electrolyte shifts from within the normal range to outside the normal range, Dr. Heitjan's means approach gives the incorrect impression that no outside-of-normal shifts occurred in any patients in the population.

Rather than the means approach, therefore, Novel's rebuttal evidence— consistent with this Court's order on remand—focused on a different question: what percentage of patients taking SUPREP experience a blood-chemistry alteration outside the normal range? That is, rather than average all patient

electrolyte levels together to determine whether the average level shifted outside

the norm, Novel looked at the individual patients in each trial to determine whether

and how many patients in the population suffered a shift in electrolyte levels from

within to outside the normal range. Novel's expert witness, Dr. Goldfarb, reviewed

the same clinical data as Dr. Heitjan and concluded:

- 18 of 18 patients (100%) in the 202 Study exhibited outside-of-normal-range electrolyte shifts after taking SUPREP (A00000011);

- 80 of 180 patients (44%) in the BLI800-302 study ("the 302 Study") exhibited outside-of-normal-range electrolyte shifts after taking SUPREP (A00000011);

- 20 of 63 patients (32%) in the BLI800-303 study ("the 303 Study") exhibited outside-of-normal-range electrolyte shifts after taking SUPREP. (A00000011.)

At trial, Braintree attacked Dr. Goldfarb's analysis of the 202 Study by

looking for clerical errors in his analysis of the scores of patients that took part in

the SUPREP clinical studies. In one instance, for example, Dr. Goldfarb

inadvertently used the normal range for a male patient in his uric acid analysis of a

female patient. (A00027252:19-A00027253:24.) In another instance, Dr. Goldfarb

found that a patient experienced outside-of-normal-range shifts for three different

electrolytes. For one of those electrolytes, Dr. Goldfarb erroneously indicated that

a patient was twice measured to have an outside-the-normal-range shift following SUPREP administration when in reality only one follow-up measurement was outside the range. (A00027254-55; A00000011-12.) But because this patient and others exhibited out-of-normal-range shifts for multiple electrolytes, even allowing for these errors results in trivial changes to the overall percentage. Thus, even viewing the data in the light most favorable to Braintree by excluding every single patient for which Braintree challenged Dr. Goldfarb's analysis—a charitable approach—the 202 Study still shows greater than 40% of patients experienced outside-of-normal-range blood-chemistry alterations.[6]

## IV.    The trial court finds Novel infringes without deciding whether Novel's ANDA Product would cause untoward effects and by using a mean-response approach.

After reviewing the evidence, the trial court concluded that SUPREP would infringe claims 15, 18, 19, 20, and 23. (A00000019.) The trial court adopted Braintree's expert's testimony that this Court's "directives" require specifically "looking at means." (A00000013-14.) The trial court concluded that "the means approach is the best methodology to utilize" to determine whether SUPREP would

_____

[6] On cross-examination, Braintree similarly attacked Dr. Goldfarb's analysis of the 303 Study, questioning his conclusion for two patients. Viewing the data in the light most favorable to Braintree by excluding those two patients, the 303 Study still shows greater than 28.5% of patients experienced outside-of-normal-range blood-chemistry alterations. (A00027242-46.) On cross, Braintree did not attack Dr. Goldfarb's analysis that 80 of 180 patients (44%) in the 302 Study exhibited outside-of-normal-range electrolyte shifts after taking SUPREP.

produce blood-chemistry alterations outside the normal range in a patient population. (A00000017.) The trial court then found that the mean "remained within the normal range after SUPREP administration. This comparison makes clear that SUPREP does not cause clinically significant electrolyte shifts in the patient population." (A00000027.)

The trial court never decided the second part of this Court's construction, "or other untoward effects." Indeed, in framing the issue of infringement in the introduction of its opinion, the trial court recited only part of this Court's construction, omitting "or other untoward effects" altogether. (A00000004.) The trial court stated "the untoward effects arguments raised by Novel in its cross-examination of Dr. Peura had no effect on the outcome of this hearing because it was not evidence of clinically significant changes in the patient population." (A00000013.) Importantly, even though the trial court determined that Novel's evidence of untoward effects would have no effect on the outcome of the hearing, the trial court found that Braintree's sole expert witness on the untoward-effect issue, Dr. Peura, was not credible because he did not investigate the issue of untoward effects: "Dr. Peura admitted he did not research the Med Watch section of the FDA website, nor did he inquire of Braintree whether there were any adverse effect reports." (A00000012.) The trial court concluded that Dr. Peura's testimony of no untoward effects was not reliable: "Based on Dr. Peura's

22

unfamiliarity with the Med Watch report and his failure to ask Braintree, his testimony regarding [untoward effects] is suspect. This broad statement of not being aware of any untoward effects of SUPREP on patients is incredulous since he did not perform any research." (A00000013.) Even though it found Braintree's expert testimony on untoward effects not credible, the trial court did not decide whether the SUPREP caused untoward effects.

## SUMMARY OF ARGUMENT

When this Court remanded the case, its claim construction mandated that the trial court determine two things in deciding whether Novel's ANDA product infringed Braintree's '149 patent. First, would Novel's ANDA product produce "untoward effects" in a patient population? Second, would Novel's ANDA product produce "alterations in blood chemistry that are outside the normal upper or lower limits of their normal range" in a patient population? *Braintree Labs.*, 479 F.3d at 1356. According to this Court's construction of the term "clinically significant electrolyte shifts," Braintree had to show that Novel's ANDA product would produce *neither* untoward effects *nor* alterations in blood chemistry that are outside the normal range. But the trial court did not follow this Court's mandate on either prong of the remanded infringement question. It therefore erred in finding infringement and this Court should reverse.

First, the trial court never decided whether Novel's accused product would produce untoward effects. Indeed, in framing the issue before it on remand, the trial court *removed* the language "or other untoward effects" from this Court's construction, (A00000004), and later stated that untoward effects were "not evidence of clinically significant electrolyte changes in the patient population." (A00000013.) The trial court legally erred by ruling there was infringement without deciding the necessary predicate that there were no untoward effects. The proper remedy for this error is reversal because the trial court has already determined, as the fact finder, that all of Braintree's evidence on this question was not credible—in the trial court's words: "incredulous" and "suspect." (A00000013.) The *only* evidence left in the record on the untoward-effects question is Novel's evidence that SUPREP *caused* patients to suffer from cardiac death, syncope, collapse, tremors, asystole (heart stoppage), abnormal heartbeat, hyponatremia, abnormally low sodium, and loss of consciousness–conditions that Braintree's expert confirmed are all "untoward effects." (A00027358, A00027360.)

Second, the trial court legally erred by misapplying this Court's claim-construction ruling that required a percentage-of-patients approach to determine whether Novel's ANDA product would produce abnormal blood-chemistry alterations in a patient population. This Court's prior opinion construed "a patient"

to mean "the general class of persons to whom the patented composition are directed" to avoid the "absurd result of infringement even if a composition causes clinically significant electrolyte shifts in a large percentage of patients." Instead of considering whether Novel's ANDA product causes a large percentage of patients in a population to have abnormal blood-chemistry alterations, the trial court used a means or average approach that only considered whether patients on average would experience abnormal blood-chemistry changes after taking Novel's ANDA product. (A00000017.)

But this means approach—as Braintree's expert agreed—masks individual data so one cannot tell the frequency with which individuals had outside-of-normal-range shifts. (A00027016:1-9.) This approach not only allows for infringement even when a large percentage of patients experience abnormal blood-chemistry alterations, but the unrebutted evidence in this case showed that a large percentage of patients in fact experienced this effect: 44% of patients in two studies and 28.5% of patients in another study.[7] (A00027184; A00027189; A00027211-12.)

---

[7] As explained above, Novel's expert determined that 18 out of 18 patients (100%) in the 202 Study experienced clinically significant electrolyte shifts. Braintree attacked some of these findings at trial, but even the most generous reading of Braintree's position still results in 44% of patients experiencing clinically significant electrolyte shifts. The 303 Study, viewed in the light most

Again, the proper remedy is reversal, not remand, because there is no evidence in the trial record that a large percentage of patients do not experience abnormal blood-chemistry alterations after taking Novel's ANDA product. That is, there is no evidence on which the trial court could base a finding that this limitation is met. Because the trial court improperly applied this Court's construction, and because there is no evidence showing that Novel's ANDA product would not produce outside-of-normal-range blood-chemistry alterations, this Court should reverse.

Finally, the trial court's means approach to determining whether a clinically significant electrolyte shift occurs, if correct, would render the claims invalid under 35 U.S.C. § 112, ¶¶ 2 and 1. First, if Braintree's means-based approach is an acceptable way to decide infringement, then there would be two ways to evaluate whether outside-of-normal-range electrolyte shifts occur—Braintree's means-based approach and this Court's percentage-based approach—with each approach yielding a different result on infringement. The claims, therefore, would be indefinite under 35 U.S.C. § 112, ¶ 2 and this Court's recent decision in *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. June 18, 2015).

---

favorable to Braintree, results in 28.5% of patients experiencing clinically significant electrolyte shifts.

Second, the '149 patent does not describe using a means-based approach to determine whether the claimed solutions cause outside-of-normal-range electrolyte shifts in a patient population. Nor is there any evidence that the inventors—at the time of the invention—contemplated such an approach to determining the absence of outside-of-normal-range electrolyte shifts, as the claims would require under the trial court's infringement analysis. If the trial court's approach is affirmed, the claims would, therefore, lack written description under 35 U.S.C. § 112, ¶ 1. Accordingly, to the extent this Court affirms the trial court's application of the construction of clinically significant electrolyte shifts, this Court should find the claims invalid under both 35 U.S.C. § 112, ¶¶ 2 and 1.

## STANDARDS OF REVIEW

Interpretation of the Court's previous mandate is a question of law that is reviewed *de novo*. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 757 F.3d 1366, 1369 (Fed. Cir. 2014) (citing *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 950-51 (Fed. Cir. 1997)). In the same vein, the district court's interpretation of a Federal Circuit claim construction is reviewed *de novo*. *Cf.*, *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 375 F.3d 1367 (Fed. Cir. 2004).

Judgments of the district court after a bench trial are reviewed "for errors of law and clearly erroneous findings of fact." *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1159 (Fed. Cir. 2012). Infringement is a question of fact that is

reviewed for clear error. *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1186 (Fed. Cir. 2014). A district court's findings of fact should not be accepted if they are "predicated on an improper legal foundation," *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956 (Fed. Cir. 1983), or if the Court is "left with a definite and firm conviction that the district court was in error." *Alcon*, 745 F.3d at 1186 (citing *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006)).

Indefiniteness is a question of law that this Court reviews *de novo*. *Teva*, 789 F.3d at 1341. Invalidity for lack of written description is a question of fact. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010).

## ARGUMENT

Under the mandate rule, "an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *ArcelorMittal France v. AK Steel Corp.*, 786 F.3d 885, 888 (Fed. Cir. 2015) (citation omitted). And the related law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) (citations omitted). Thus, the trial court was required to apply this Court's claim constructions from the first appeal. *See, e.g.*, *ArcelorMittal France v. AK Steel Corp.*, 786 F.3d at 888-90 (holding that "the district court was bound by this

court's prior construction of the original claims"). It did not do so, and its failure

constitutes reversible error.

I.    **This Court should reverse because the trial court reached its conclusion of infringement without deciding whether SUPREP causes "other untoward effects."**

The trial court did not decide one half of the infringement issue on remand—

whether SUPREP produced untoward effects in a patient population. *Braintree*

*Labs.*, 749 F.3d at 1356. The trial court's error was a legal one; it simply failed to

follow this Court's claim construction mandate. The proper remedy for this error is

reversal, not remand, because Braintree did not present any credible evidence

showing SUPREP did not cause untoward effects; in fact, the trial court discredited

Braintree's single, conclusory line of testimony on the subject. As a matter of law,

Braintree cannot meet its burden of proof that SUPREP, and by equivalence

Novel's ANDA product, does not produce any untoward effects after SUPREP

administration. On this basis alone, a finding of non-infringement is warranted.

A.    **The trial court erred by failing to decide whether SUPREP caused untoward effects.**

This Court's mandate in the first appeal was a "remand for further factual

findings to determine whether the composition covered by Novel's ANDA product

infringes under the new claim construction articulated herein." *Braintree Labs.*,

749 F.3d at 1352. For there to be infringement, that claim construction required

two things: (i) that Novel's ANDA product not cause untoward effects; and (ii) that

Novel's ANDA product not cause outside-of-normal-range blood-chemistry
alterations. *Id.* at 1356. But the trial court never decided the first of those issues.

Instead, the trial court dismissed the untoward-effects issue as irrelevant:
"the untoward effects arguments raised by Novel in its cross-examination of Dr.
Peura had no effect on the outcome of the hearing because it was not evidence of
clinically significant electrolyte changes in the patient population." (A00000013.)
It was legal error for the trial court to find infringement without first finding
Novel's ANDA product would not produce untoward effects in patients.

**B.    The proper remedy for the trial court's error in failing to decide the
untoward-effect question is reversal, not remand, because the trial court
has already discredited Braintree's evidence on the question.**

Reversal, not remand, is the appropriate remedy for the trial court's error in
skipping over the untoward-effects question, because there is no credible evidence
on which the trial court could have decided this issue in Braintree's favor.
Braintree gave short shrift to the untoward-effects element of its infringement case,
basing its entire showing on a single statement from Dr. Peura: "I've seen no
evidence in the materials that I've reviewed that SUPREP is associated with
untoward effects." (A00027083.) But the trial court discredited Dr. Peura's
testimony, finding that because Dr. Peura had failed to investigate the issue, his
testimony regarding untoward effects was "suspect" and his statement that he was
not aware of any untoward effects "incredulous." (A00000013.) This Court should

30

reverse because there is nothing left for the trial court to decide—Braintree, the party with the burden of proof, has a failure of proofs on this issue.

## C. The evidence of record shows that SUPREP produces untoward effects in a patient population.

While Braintree failed to adduce any credible evidence regarding untoward effects and the trial court did not decide untoward effects in its opinion on remand, the evidence of record shows that administration of SUPREP produces untoward effects. The trial court, operating under the mischaracterization of this Court's claim construction as requiring absence of *either* alterations in blood chemistry or untoward effects, dismissed this significant evidence of heart stoppage, collapse, slurred speech, tremors, and even cardiac death as "anecdotal." (A00000013.)

Undisputed evidence shows SUPREP caused untoward effects in patients. FDA's Medical Clinical reviewer on Braintree SUPREP trial found evidence of bradycardia[8] in 9.9% of SUPREP patients. (A00019372-73.) And Braintree's SUPREP label lists "AV Block"[9] as an example of a less common adverse reaction occurring after SUPREP administration. (A00016255.)

---

[8] Dr. Peura testified that "bradycardia" is an example of an abnormal heartbeat "when your heart beats more slowly." (A00027352.)

[9] AV Block occurs when a patient's heart does not beat properly. (A00027353.)

Further, during its cross-examination of Dr. Peura, Novel introduced Med Watch adverse-event reports showing SUPREP caused untoward effects in patients:

- A patient who, after SUPREP administration, suffered from "Abdominal distension, Dyspnea, Malaise, and Sudden cardiac death." (A00019865; A00027356-27357.) The doctor that signed the death certificate said that the patient had sudden cardiac onset, believed to have originated from SUPREP. (A00019866.)

- A patient who, after SUPREP administration, suffered from "syncope, collapse, slurred speech, tremors, confusion." (A00019856; A00027354-27355.) The reports states that the "Event occurred thereafter 1st dose of bowel prep for colonoscopy, squad to ER then admitted to hospital overnight." (A00019856.)

- A patient who, after SUPREP administration, suffered from asystole (heart stoppage) for 13 seconds. (A00019843; A00027357-27358.) The examining doctor believed this was attributable to SUPREP. (A00019843; A00027357-27358.)

- A patient who, after SUPREP administration, suffered from hyponatremia (abnormally low sodium) that caused the patient to lose consciousness for two days. (A00019857; A00027359-27360; *see also*

A00019848-19850, detailing the manufacturer's mandatory adverse

event report for the same event using FDA Form 3500A, identifying

'149 patent inventor and Braintree executive Mark B. Cleveland as

the contact person.)

After reviewing the reports during cross-examination, Dr. Peura did not

dispute that SUPREP caused these events: "Somebody has concluded that

SUPREP may have been responsible for these adverse events, and I have no reason

to dispute that." (A00027358.)

## II. The trial court did not properly apply this Court's claim construction in deciding SUPREP did not produce blood-chemistry alterations outside the normal range; the Court should reverse the infringement judgment.

This Court's constructions of "a patient" and "clinically significant

electrolyte shifts" required that Braintree prove that SUPREP would not produce

blood-chemistry alterations outside the normal range in a patient population using

a percentage-patient approach. This Court crafted these constructions to avoid the

absurd result of infringement when a large percentage of patients experienced a

clinically significant electrolyte shift. The approach mandated by this Court's

decision was one considering the percentage of patients who experienced out-of-

normal-range blood-chemistry alterations after taking SUPREP. But the trial court

did not follow this Court's construction and instead considered whether all

patients, when averaged, had mean blood chemistry that did not fall outside normal

ranges. That approach arrived at an equally absurd result that this Court's construction attempted to avoid. Because there was no evidence supporting infringement under this claim limitation, as this Court previously construed it, this Court should reverse the trial court's judgment of infringement.

A.    **This Court has already construed the '149 patent to require a percentage-patient approach in judging whether SUPREP would produce a clinically significant electrolyte shift in a patient population.**

This Court's opinion requires that the question of whether the accused product causes blood-chemistry alterations that are outside the normal range be determined by examining the *percentage* of patients experiencing clinically significant electrolyte shifts as a result of SUPREP administration.

In its prior appeal in this case, this Court adopted Novel's construction for "a patient" and rejected Braintree's because it would lead "to the absurd result of infringement even if a composition causes clinically significant electrolyte shifts in a large percentage of patients." *Braintree Labs.*, 749 F.3d at 1357.

The panel's concurring and dissenting opinions reflected the same understanding of the Court's construction: infringement was to be assessed by assessing the percentage of patients experiencing out-of-normal-range blood-chemistry alterations. Judge Dyk's concurring opinion stated: "The sole evidence in the summary judgment record concerning the percentage of individuals experiencing such electrolyte shifts is data from two clinical trials of SUPREP, and

34

those data are sufficient to show that the claim limitation was not met." *Id.* at 1361

n.1. As Judge Dyk observed, one of those trials showed a majority of patients had

clinically significant electrolyte shifts and the other trial showed a significant

minority (about one-third) had clinically significant electrolyte shifts. *Id.*

The dissenting opinion criticized the majority's claim-construction ruling

because it presented practical difficulties in assessing what percentage of patients

would place a composition inside or outside the scope of the claims: "What

percentage of people constitutes a patient population?" *Id.* at 1367 n.3. Yet the

panel judges unanimously understood that the issue should be framed as

determining the percentage of patients within a population experiencing alterations

in blood chemistry beyond the normal ranges.

In sum, this Court's opinion, as well as the concurring and dissenting

opinions, mandates that the question of whether Novel's ANDA product produces

electrolyte shifts be measured by considering the percentage of affected patients.

**B.     The trial court erred because it applied a means approach, not the
mandated percentage approach, and arrived at an equally absurd result
this Court's construction attempted to avoid.**

Given this Court's mandate that the "a patient" claim element be evaluated

based on whether there was a large percentage of individual patients that

experienced abnormal blood-chemistry alterations, the trial court's failure to apply

that approach is reversible error. *See Florida Power & Light Co. v. United States*,

35

103 Fed. App'x 669, 673 (Fed. Cir. 2004) (the trial court's failure to make a determination in accord with the Federal Circuit's mandate was erroneous). To be sure, the dissenting opinion in the prior appeal criticized the majority's percentage approach: "Changing 'a patient' to 'a patient population' is pernicious for practical reasons as well…What percentage of people represents a patient population?" *Braintree Labs.*, 749 F.3d at 1367 n.3. The district court rejected the percentage approach because it was "qualitative" and "gave rise to the question about whether the percentage analysis was valid because it may vary among POSITAs." (A00000015.) But even in the face of the dissent's critique, the trial court was bound to follow the majority opinion. That it failed to do so was error.

And the trial court's departure from the percentage-patient to the means approach was not harmless error because the trial court's approach allowed for (and resulted in) an equally absurd result that the Court's construction of "a patient" was designed to avoid—infringement even where a large percentage of patients experience clinically significant electrolyte shifts.

Braintree's witness, Dr. Heitjan, agreed that by using the means approach "data about an individual patient can be masked." (A00027016.) And he agreed that when looking at mean data "you're not able to tell the frequency by which individuals within a study group had out-of-range shifts." (A00027016.) What is more, Heitjan showed, by way of a hypothetical, how every patient could have out-

36

of-normal-range shifts but the mean would remain in the normal range. (A00026999; A00027001.) Heitjan agreed that in a hypothetical study involving two patients, if one patient had abnormally high shift and the other patient had an equal and offsetting abnormally low shift for a particular biomarker, he would conclude the patient population did *not* have a clinically significant electrolyte shift because the means would remain in the normal range. (A00027000-01.)

The only percentage-patient evidence showed that *at least* 8 of 18[10] patients in the 202 Study experienced outside-of-normal-range blood-chemistry shifts after taking SUPREP. (A00027184.) But Dr. Heitjan, applying the means approach to the 202 Study, opined that because the "means stay well within the normal range" for these 18 patients when averaged, (A00026967), there was "no clinically significant electrolyte shifts" for the patients in the BLI800-202 clinical trial. (A00026975.)

A similarly high percentage of patients in the other SUPREP clinical trials experience outside-of-normal-range blood-chemistry shifts: 80 of 180 (44%) of patients in the 302 Study and at least 18 of 63 (28.5%) of patients in the 303 Study. (A00027189; A00027211-27212.)

_____

[10] Again, in Novel's view this number is 18 of 18, but the number most charitable to Braintree is provided here.

**C.    This Court should reverse the trial court's finding of infringement because Braintree did not introduce any evidence showing that SUPREP does not produce blood-chemistry alterations outside normal range for any percentage of patients.**

The appropriate remedy here is reversal because Braintree did not present any evidence showing that SUPREP does not produce blood-chemistry alterations outside normal range for a large percentage of patients. Its sole evidence on the issue was Heitjan's means data.

Indeed the only trial evidence about the percentage of patients experiencing out-of-normal-range blood-chemistry alterations showed that a substantial percentage had this effect:

- At least 8 out of 18 patients exhibited outside-of-normal range shifts in the 202 Study (A00027184);

- 80 out of 180 (44%) patients exhibited outside-of-normal range shifts in the 302 Study (A00027189);

- At least 18 out of 63 (28.5%) patients exhibited outside-of-normal range shifts in the 303 Study (A00027211-27212);

- Braintree states in its SUPREP label that "the most important information [you] should know about SUPREP" is that "can cause serious side effects, including… changes in blood salts (electrolytes) in your blood" (A00016263; *see also* A00027127); and

- Braintree's SUPREP label shows the percentages of patients who developed new blood-chemistry abnormalities after taking SUPREP:

Table 2 shows the percentages of patients who developed new abnormalities of important electrolytes and uric acid after completing the bowel preparation with either SUPREP Bowel Prep Kit or PEG+E administered as a split-dose (2-day) regimen.

Table 2: Patients with Normal Baseline Serum Chemistry with A Shift to an Abnormal Value While on the Split-Dose (2-Day) Regimen

|  |  | Day of Colonoscopy n (%)* | Day 30 n (%)* |
|---|---|---|---|
| Anion gap (high) † | SUPREP | 14 (8.9) | 3 (1.9) |
|  | PEG + Electrolytes | 12 (7.6) | 2 (1.4) |
| Bicarbonate (low) | SUPREP | 20 (12.7) | 7 (4.4) |
|  | PEG + Electrolytes | 24 (15.2) | 4 (2.7) |
| Bilirubin, total (high) | SUPREP | 14 (8.5) | 0 (0) |
|  | PEG + Electrolytes | 20 (11.7) | 3 (1.9) |
| BUN (high) | SUPREP | 2 (1.6) | 14 (11.2) |
|  | PEG + Electrolytes | 4 (2.9) | 19 (14.5) |
| Calcium (high) | SUPREP | 16 (10.4) | 8 (5.2) |
|  | PEG + Electrolytes | 6 (3.7) | 6 (3.9) |
| Chloride (high) | SUPREP | 4 (2.4) | 6 (3.7) |
|  | PEG + Electrolytes | 20 (12.2) | 6 (3.8) |

| Creatinine (high) | SUPREP | 3 (1.9) | 5 (3.2) |
|---|---|---|---|
| | PEG + Electrolytes | 2 (1.2) | 8 (5.2) |
| Osmolality (high) | SUPREP | 8 (5.8) | NA |
| | PEG + Electrolytes | 19 (12.9) | NA |
| Osmolality (low) | SUPREP | 3 (2.2) | NA |
| | PEG + Electrolytes | 2 (1.4) | NA |
| Potassium (high) | SUPREP | 3 (1.8) | 6 (3.7) |
| | PEG + Electrolytes | 5 (2.9) | 8 (4.9) |
| Sodium (low) | SUPREP | 5 (3.1) | 1 (0.6) |
| | PEG + Electrolytes | 4 (2.3) | 2 (1.2) |
| Uric acid (high) | SUPREP | 27 (23.5) | 13 (11.5) |
| | PEG + Electrolytes | 12 (9.5) | 20 (16.7) |

*Percent (n/N) of patients where N=number of patients with normal baseline who had abnormal values at the timepoint(s) of interest.

†Patients with normal bicarbonate at baseline who developed low bicarbonate ($\leq$ 21 mEq/L) and high anion gap ($\geq$ 13 mEq/L) on Day of Colonoscopy or Day 30.

(A00016255-16256.) Novel's ANDA product will be required to replicate the label data above.

Because there is no evidence in the trial record showing that SUPREP does not cause out-of-normal-range blood-chemistry alterations in a percentage of patients, this Court should reverse the trial court's judgment of infringement.

## III.  The trial court did not consider invalidity under 35 U.S.C. § 112.

To the extent that this Court interprets its mandate in a way that does not require a percentage approach, as Novel has argued above, the claims are rendered invalid as indefinite under 35 U.S.C. § 112, ¶ 2 and for lack of written description under § 112, ¶ 1. Both of these grounds necessarily flow from the trial court's adoption of Braintree's means approach.

**A.    The trial court's use of a means-based analysis instead of using patient percentages renders the claims indefinite under *Teva*.**

By adopting Braintree's means approach, the trial court rendered the asserted claims invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2 and this Court's recent decision in *Teva*.[11] As this Court explained in *Teva*, "[a] patent is indefinite 'if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, *with reasonable certainty*, those skilled in the art about the scope of the invention." *Teva*, 789 F.3d at 1340-41 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014)) (emphasis added).

The asserted claims are indefinite under *Teva* because the patent does not explain what analysis a POSITA must use to determine whether a patient population has experienced "alterations in blood chemistry that are outside the normal upper and lower limits." The parties have presented two different methodologies: the means and percentage methods, each of which result in

---

[11] Novel recognizes that it did not raise this issue below, but it was not ripe until (i) the trial court ignored this Court's claim construction in the post-trial opinion, and (ii) this Court issued the *Teva* decision, which was published 16 days after Novel filed its initial notice of appeal. This Court may appropriately consider in the first instance Novel's indefiniteness defense. *See Hormel v. Helvering*, 312 U.S. 552, 558-59 (1941) (an appellate court may consider an argument not raised below when "there have been judicial interpretations of existing law after decision below and pending appeal—interpretations which if applied might have materially altered the result."); *see also Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1344-45 (Fed. Cir. 2001).

41

different infringement outcomes. For example, Braintree's expert conceded at trial that the means approach may result in infringement even in a patient population where *every* patient has experienced a shift outside of the normal range. (A00026998-26999.) Meanwhile, the percentage approach would require a finding of non-infringement under the same facts because *100% of patients* experienced clinically significant electrolyte shifts.

In *Teva*, this Court held that the claim term "molecular weight" was indefinite because the molecular weight could be ascertained using three different measurement approaches. As this Court explained:

> To summarize, it is undisputed that "molecular weight" or average molecular weight can be ascertained by any of three possible measures: $M_p$, $M_n$, and $M_w$. The claims do not indicate which measure to use. The specification never defines molecular weight or even mentions $M_p$, $M_n$, and $M_w$. And the term "average molecular weight" does not have a plain meaning to one of skill in the art.
>
> * * *
>
> We hold that claim 1 is invalid for indefiniteness by clear and convincing evidence because read in light of the specification and the prosecution history, the patentee has failed to inform with *reasonable certainty* those skilled in the art about the scope of the invention.

*Teva*, 789 F.3d at 1344-45 (emphasis in Federal Circuit's opinion).

The asserted claims in this action mirror those in *Teva*. Assuming that the means and percentage approaches are both viable ways to measure whether a patient population has experienced a clinically significant electrolyte shift, the claims, the specification, and the prosecution history do not inform the ordinarily

skilled artisan to choose mean values. Thus, if averages are to be permitted as a measurement methodology, the claims "fail[] to inform with reasonable certainty those skilled in the art about the scope of the invention," and they must be found indefinite.

## B.    At the time of the invention, the patentees were not in possession of a composition that—based on mean data—did not produce any clinically significant electrolyte shifts.

By accepting Braintree's means-based approach, the trial court also rendered the claims invalid for lack of written description under 35 U.S.C. 112, ¶ 1. The patentees disclosed no mean-data-based analysis of electrolyte shifts for any of the compositions disclosed in the '149 patent specification. In post-trial briefing, Novel raised this issue with the trial court, but the trial court did not consider the issue and thus made no related findings of fact.

The "purpose of the written description requirement is broader than to merely explain how to 'make and use'" the invention. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). The written-description requirement ensures that "the scope of the right to exclude, as set forth in the claims, does not over-reach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000).

The test for sufficiency of a written description is "whether the disclosure clearly 'allow[s] persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (quoting *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1562-63 (Fed. Cir. 1991)). The disclosure must "reasonably convey[ ] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* at 1351. Possession means "possession as shown in the disclosure" and "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Id.* A "mere wish or plan" for obtaining the claimed invention does not satisfy the written-description requirement. *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997). Expert testimony "interpreting" a patent's specification is not required: the Federal Circuit has expressly rejected the contention that a patent may not be held invalid on its face. *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 927 (Fed. Cir. 2004). In *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002), for example, the Federal Circuit held that a patent can be held invalid for failure to meet the written-description requirement based solely on the language of the patent specification.

It is undisputed that the '149 patent discloses only four phosphate-free sulfate salt compositions, and three of those compositions were administered to

*only one patient.*[12] Upon this disclosure, the inventors claim to have determined

compositions having effects on blood chemistry that were either clinically

significant or clinically insignificant. (A00016245, 10:20-35; *id.* at 10:32-33

"Electrolyte changes were clinically insignificant with this formulation.")

The inventors therefore could not calculate mean data from those single

administrations, because, as Braintree's experts agree, you cannot obtain a mean

value from a single data point. (A00027324:15 (Peura) "Well, you couldn't do an

average of one.") Dr. Peura confirmed this point:

> Q. So you're saying that you can make a conclusion as to whether
> something is clinically significant or not clinically significant based
> on a single measurement; is that what you're saying?
>
> A. In a -- in a study of one patient, yes. You can do that.
>
> Q. And in a study of one patient, you do not have access to a mean;
> isn't that correct?
>
> A. Correct.

(A00027325:12-19 (Peura); *see also* A00027326:7-9 (Peura) "Q. But there's no

patient population that's tested for solution D, is there? A. Not in the patent.") Not

only did the inventors not possess SUPREP, they did not test the compositions

---

[12] For clarity, none of the compositions in the '149 patent have the same
composition as SUPREP. A00027166:8-10. SUPREP was not developed until
more than six years after the alleged invention date. The composition disclosed in
the '149 patent having the most similar properties to SUPREP is Solution D, which
was tested only once in a human. But Dr. Peura confirmed that Solution D is not
SUPREP. A00027347:8-9.

disclosed in the '149 patent in a patient population using the means approach that Braintree now uses to show infringement. The specification does not disclose compositions in which mean electrolyte levels before and after administration of a described composition were compared to determine whether a shift outside the norm occurred in the patient population. In other words, the inventors never had possession of the invention that Braintree advocates now in this litigation—a composition that does not produce any clinically significant electrolyte shifts in a patient population evaluated using mean values of blood chemistry measurements in a representative sample. Accordingly, the asserted claims are not supported by an adequate written description.

## CONCLUSION AND RELIEF SOUGHT

This Court should reverse the trial court's infringement judgment. The trial court erred by failing to follow this Court's mandate. First, the trial court did not decide whether Novel's ANDA product would produce "untoward effects"—a limitation that this Court held was necessary for infringement. The appropriate remedy is reversal because there is nothing for the trial court to decide; the trial court discredited Braintree's single line of testimony on this issue, leaving only Novel's evidence. Second, the trial court erred by ignoring this Court's mandate to apply a percentage-patient approach, instead applying a means approach that resulted in the absurd result this Court's prior claim construction avoided—

infringement even though a large percentage of patients experienced electrolyte shifts. Again, the proper remedy is reversal because there is no trial evidence showing that Novel's ANDA product does not produce out-of-normal-range blood-chemistry alteration in a large percentage of patients.

If the trial court's infringement judgment is affirmed, then this Court should find the claims invalid as indefinite and lacking an adequate written description.

Novel asks that the Court reverse the trial court's infringement judgment, remand with instruction to enter a judgment of no infringement, and grant such other relief as this Court may deem appropriate.

Respectfully submitted,

Dated: September 9, 2015

/s/ H. Keeto Sabharwal
H. Keeto Sabharwal
Byron L. Pickard
Nirav N. Desai
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600

*Counsel for Defendant-Appellant*
*Novel Laboratories, Inc.*

## ADDENDUM TABLE OF CONTENTS

**<u>ITEM</u>**                                                                    **<u>PAGE</u>**

Final Order of Amended Judgment (D.I. 467)..........................................A00000001

Memorandum Opinion (D.I. 461)........................................ A00000004-A00000029

US 6,946,149.................................................................... A00000030-A00000040.1

**CLOSED**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BRAINTREE LABORATORIES, INC., | ) ) ) ) |
| Plaintiff, | ) **Civil Action No 3:11-cv-01341** |
| v. | ) **(PGS) (LHG)** |
| NOVEL LABORATORIES, INC., | ) |
| Defendant. | ) ) |

## FINAL ORDER OF AMENDED JUDGMENT

The Court having held a bench trial on February 9, 10, and 11, 2015, on remand from the Federal Circuit Court of Appeals, as to U.S. Patent Number 6,946,149 (the "'149 Patent"), and the Court having heard the testimony of the witnesses, made rulings during trial, and considered the proposed findings of fact and conclusions of law submitted by the parties, for the reasons set forth in the Court's Opinion and Order dated June 1, 2015 (Dkt. Nos. 461, 462); its prior Opinions and Orders dated November 7, 2014 (Dkt. No. 411), November 6, 2014 (Telephone Conference), June 18, 2013 (Dkt. No. 389), June 4, 2013 (Dkt. Nos. 380, 381), January 18, 2013 (Dkt. Nos. 261, 262), February 1, 2013 (Telephone

Conference), February 5, 2013 (Dkt. No. 332), February 6, 2013 (Trial Tr. 425:1-426:23), and February 8, 2013 (Trial Tr. 624:3-638:16); and the United States Court of Appeals for the Federal Circuit's opinion and mandate (Dkt. Nos. 398, 399), and for good cause shown, in amendment of the Final Order of Judgment entered June 1, 2015 (Dkt. No. 262), and in reinstatement of the injunctions entered by the Court on June 18, 2013 (Dkt. No. 389),

**IT IS ORDERED** that the motion to Amend the Final Order of Judgment (ECF No. 464) is granted as set forth below; and it is further;

**ORDERED AND ADJUDGED** that an Amended Judgment is entered in favor of plaintiff Braintree Laboratories, Inc. ("Braintree") and against defendant Novel Laboratories, Inc. ("Novel") on Braintree's claims that Novel has infringed claims 15, 18, 19, 20, and 23 of the '149 Patent;

**AND IT IS FURTHER ORDERED AND ADJUDGED** that:

1. SUPREP meets each and every limitation of claims 15 and 18 of the '149 Patent;

2. Novel's "equivalent" of SUPREP will, if marketed and sold, infringe claims 15 and 18 of the '149 Patent;

3. Novel's "equivalent" of SUPREP will, if marketed and sold, induce infringement of claims 19, 20, and 23 of the '149 Patent, which claim methods for using the compositions of claims 15 and 18 of the '149 Patent;

4. Novel is not entitled to an adverse inference against Braintree, on the basis of failure to provide documents under Fed. R. Civ. P. 37;

**AND IT IS FURTHER ORDERED** that, pursuant to 35 U.S.C. §271(e)(4)(A), the effective date of any final approval of Novel's Abbreviated New Drug Application ("ANDA") No. 202511 by the United States Food and Drug Administration shall be a date which is not earlier than the expiration date of the '149 Patent, including any extension of the term of that patent or any exclusivity to which Braintree is or becomes entitled;

**AND IT IS FURTHER ORDERED** that, pursuant to 35 U.S.C. §271(e)(4)(B), Novel, its successors-in-interest, officers, agents, employees and attorneys, and those persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, are hereby enjoined from commercially making, using, offering to sell, or selling within the United States, or importing into the United States, the product that is the subject of Novel's ANDA No. 202511, until the expiration date of the '149 Patent, including any extension of the term of that patent or any exclusivity to which Braintree is or becomes entitled.

_Peter M Sheridan_  4/25/15

PETER G. SHERIDAN, U.S.D.J.

**A00000003**

RECEIVED

JUN - 1 2015

AT 8:30_____M
WILLIAM T. WALSH
CLERK

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRAINTREE LABORATORIES, INC.<br><br>    Plaintiff<br><br>v.<br><br>NOVEL LABORATORIES, INC.,<br><br>    Defendants | Case No.  3:11-cv-01341-PGS-LHG<br><br><br>MEMORANDUM OPINION |

SHERIDAN, District Judge.

### INTRODUCTION

This matter is before the Court on remand from the Federal Circuit.  The Federal Circuit reversed this Court's decision granting summary judgment in favor of Plaintiff, Braintree Laboratories, Inc. ("Braintree") and findings that Defendant, Novel Laboratories, Inc. ("Novel") infringed Claims 15, 18, 19, 20, and 23 of the '149 patent.  That reversal was based upon the Federal Circuit's finding that two claim terms—"clinically significant electrolyte shifts" and "patient"—were improperly construed by this Court. Specifically, the Federal Circuit defined the term "clinically significant electrolyte shifts" and the term "patient," and directed the Court to find whether "SUPREP avoids" producing any "alterations in blood chemistry [electrolyte] that are outside the normal upper or lower limits of their normal range" in the general class of persons to whom the patent compositions are directed, i.e. a patient population. *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356, 1357 (Fed. Cir.), *cert. denied*, 135 S. Ct. 764 (2014).  On remand, the Federal Circuit ordered this Court to review the issues of fact—that is, the electrolyte shifts

1

experienced by some of the patients in clinical trials—in light of their "clinical significance." This Court conducted a hearing and limited the proofs to that inquiry.

During that hearing the Court acted as the trier of fact and it adopted the standards which are ordinarily utilized by a jury to evaluate the credibility and weight of the evidence. See, Model Jury Charges of the Third Circuit, §§ 1.5, 1.6, and 1.7.

## LEGAL STANDARD

Braintree has the burden of proving infringement by a preponderance of the evidence. *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011). To satisfy the preponderance standard, Braintree need not produce "definite" proof of infringement, but must instead demonstrate that "infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharaceuticals, USA, Inc.*, 418 F.3d 1326 (2005)

Courts use a two-step analysis to determine infringement under 35 U.S.C. § 271. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). "[F]irst, the court determines the meaning of the disputed claim terms, then the accused device is compared to the claims as construed to determine infringement." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 804 (Fed. Cir. 2007). Literal infringement is proven when each and every claimed limitation is present in the accused product. *Renishaw PLC v. Marposs Societa´ per Azioni*, 158 F.3d 1243, 1247-48 (Fed. Cir. 1998). Application of a patent claim to an accused product is a fact-specific inquiry. *Kustom Signals, Inc. v. Applied Concepts. Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001).

In addition, 35 U.S.C. § 271(e)(2)(A) provides that it shall be an act of infringement to submit an Abbreviated New Drug Application ("ANDA") "if the purpose of such submission is to obtain approval . . . to engage in the commercial manufacture, use, or sale of a drug . . . claimed in a patent or the use of which is claimed in a patent before the expiration of such patent." The

2

infringement analysis compares the asserted claims and the proposed generic product that is likely to be sold following FDA approval. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997); *see also Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002).

## FINDINGS OF FACT

In light of the testimony, including the credibility of witnesses and the evidence of proof, the Court finds the following facts:

1.      The parties agreed that the following claims, 15, 18, 19, 20, and 23 of the '149 patent are in issue.  Claims 15 and 18 are independent composition claims. Claims 19, 20, and 23 are dependent method claims.

Patient Population

2.      As noted above, the federal circuit defined patient population to be "the general class of persons to whom the patent composition are directed." *Braintree*, 749 F.3d at 1356, 1357.

3.      In order to determine whether the "percentage" or the "means" approach was appropriate, there was a need to determine what constitutes "patient population."

4.      In order to evaluate the general class of patient or the patient population, the parties agreed that patient population includes a person that a doctor has said has a need for a colonoscopy. There are two categories of such people: 1) people over 50 who have colonoscopies for screening for polyps and cancer; and 2) people of any age who have some need for intestinal surgery or other procedure requiring a clear colon.

5.      The general class of persons to whom SUPREP is directed is more limited than the broader rules above: adults who are indicated for colonoscopy and who do not have a contraindication for SUPREP. Tr. 153:24- 154:21, 156:5-14, 157:7-13 (Peura Direct); Tr. 32:24-33:3, 63:22-25 (Heitjan Direct); see also 249:1-23 (Sconzo Direct).

3

**A00000006**

6.      A person is "indicated for" colonoscopy if a healthcare provider has made a decision that there is a reason for the patient to undergo colonoscopy. A "contraindication" is a condition for which a certain medication should not be administered because the medication may have an adverse effect on the patient's health. Tr. 153:24-154:21, 157:7-13 (Peura Direct).

7.      The contraindications for SUPREP are listed in the SUPREP label. Patients suffering from these conditions would not be included in the SUPREP patient population. Tr. 154:22-156:14 (Peura Direct); PTX076 (SUPREP Label) at BRTSUP00000129.

Clinical Trials

8.      It was uncontroverted that there were four SUPREP clinical trials conducted by Braintree at the direction of the FDA. Each study constituted of patients within the patient population.  Braintree's and Novel's experts (Dr. Heitjan and Dr. Goldfarb, respectively) used those trials to support their findings.

9.      There are four SUPREP clinical trials: BLI800–301; BLI800–302; BLI800–303; and BLI800– 202 (collectively "the SUPREP clinical trials"). Tr. 55:23–56; PDX11–8, 11-10 (Heitjan Slides).

10.      BLI800 – 301 involved 194 subjects randomly assigned to receive SUPREP and 193 subjects randomly assigned to receive a prep called MoviPrep. All subjects received two bottles of the prep, 1-3 hours apart, on the day before colonoscopy. Three blood draws were taken: one screening draw several days before taking the prep, one just before colonoscopy after the second bottle was taken, and one about a month after the colonoscopy. Tr. 57:9-58:6 (Heitjan Direct); PDX11-7 (Heitjan Slides); PTX411 (BLI800-301 Clinical Study Report).

11.      BLI800-302 involved 181 subjects randomly assigned to receive SUPREP and

4

183 subjects randomly assigned to receive MoviPrep. Taking a split-dose regimen for SUPREP, the subjects receiving SUPREP took two bottles of the prep 10 to 12 hours apart. Three blood draws were taken, with the same timing as in the 301 study. Tr. 58:7- 19 (Heitjan Direct); PDX11-8 (Heitjan Slides); PTX387 (BLI800-302 Clinical Study Report); PTX76 (SUPREP Label) at 2.

12.    BLI800-303 involved 63 subjects randomly assigned to receive SUPREP and 67 subjects randomly assigned to receive NuLytely. Consistent with the FDA-approved split-dose regimen for SUPREP, the subjects receiving SUPREP took two bottles of the prep 12 hours apart. Two blood draws were taken: one at screening (before the prep was taken), and one just before colonoscopy after the second bottle was taken. Tr. 58:20-59:9 (Heitjan Direct); PDX11-9 (Heitjan Slides); PTX394 (Rex 2010 Article); PTX76 (SUPREP Label) at 2.

13.    BLI800-202 was a pharmacokinetic/pharmacodynamic study, in which frequent blood measurements are taken to determine the time course of any effects of treatment. The study involved 18 subjects: 6 healthy, 6 with moderate renal impairment, and 6 with mild/moderate hepatic impairment. All subjects received two bottles of SUPREP 12 hours apart. The subjects had three pre-treatment ("baseline") blood draws – one at a screening visit, one a day before taking the prep, and one immediately before the first bottle. They also had many blood draws after taking the prep: at 1, 2, 4, 8, and 10 hours after the first bottle, 10 minutes before the second bottle, 1, 2, 4, 8, 12, and 18 hours after the second bottle, and before noon on follow up days 3 and 6. No colonoscopies were performed. Tr. 59:10-60:14 (Heitjan Direct); PDX11-10 (Heitjan Slides); PTX410 (BLI800-202 Clinical Study Report).

14.    BLI800-301 and 302 had the same normal ranges for each electrolyte measured. The 202 and 303 studies had different normal ranges than the 301 and 302 studies. Because of these differences, an electrolyte value could be inside the normal range for one study but outside

5

the normal range for another study. Tr. 61:1-9; 63:10-21 (Heitjan Direct); PDX11-11 (Heitjan Slides); PTX410 (BLI800-202 Clinical Study Report) at 219, 224; PTX411 (BLI800-301 Clinical Study Report) at 47; PTX387 (BLI800-302 Clinical Study Report) at 45; PTX394 (Rex 2010) at 335.

Witnesses

15.    Each party presented two witnesses. Braintree's witnesses were Dr. Heitjan and Dr. Peura. Novel's witnesses were Dr. Goldfarb and Dr. Sconzo. A brief description of each witness's experience is set forth below.

16.    Dr. Daniel Heitjan is currently a professor of statistical science at Southern Methodist University, and professor of biostatistics at the University of Texas Southwestern Medical Center. Tr. 29:7-6 (Heitjan Direct). He was previously a statistics professor at the University of Pennsylvania for 11 years. PTX486 (Heitjan CV). Dr. Heitjan has many years of experience in the design, conduct, and analysis of clinical trials, and in particular in the interpretation of clinical trial data. T32:8-11 (Heitjan Direct); Tr. 133:20-124:10 (Heitjan Re-Direct); PTX486 (Heitjan CV). The Court admitted Dr. Heitjan as an expert in biostatistics. Tr. 30:14-31:5 (Heitjan Direct). Dr. Heitjan is not a person of ordinary skill in the art ("POSITA") as defined during the original trial.

17.    Dr. David Peura, a gastroenterologist, has served as an emeritus professor at the University of Virginia since 2008. ECF No. 380 ("Validity Op.") at 4; PTX485 (Peura CV). Dr. Peura is an expert in gastroenterology, gastrointestinal procedures, and the use of preparations to prepare patients for gastrointestinal procedures. Validity Op. at 5. Dr. Peura is also an expert with respect to electrolyte shifts and transfers that take place when an osmotic laxative, like SUPREP, is ingested. Tr. 146:14-25 (Peura Direct).

18.    Dr. David Goldfarb testified at the original trial.  He is a nephrologist who specializes in diagnosing, assessing, and treating kidney diseases, including diseases associated with electrolytes, fluid, and electrolyte balance. Tr. 288:5-9, 289:12-17; Tr. 113:17-23, 260:14-22, 261:12-20.  Dr. Goldfarb is an expert in electrolytes, electrolyte shifts, and evaluating electrolyte physiology in response to the administration of a bowel prep. Tr. 289:18-25. Dr. Goldfarb is a POSITA as it relates to the '149 patent. Tr. 300:16-24.

19.    Dr. Sconzo is a gastroenterologist who regularly practices in Long Island.  He is board certified for colon-rectal surgery by the Fellow American College of Surgeons and the Fellow American College of Colon Rectal Surgeons.  DTX691 (Sconzo CV).  Dr. Sconzo is a POSITA as defined in the original trial. Tr. 248:4-6. He was admitted as an expert in "colorectal surgery, including administration of colonoscopies, and the use of preps to prepare patients for colorectal surgical procedures."  Tr. 246:11-19.

Credibility of Witnesses

20.    Braintree's witnesses were more credible than Novel's witnesses. More specifically, Dr. Goldfarb testified honestly and comprehensively at the original trial; but here his testimony was riddled with minor errors, and this Court finds it was less than credible.  Therefore, Dr. Goldfarb's testimony is given less weight than that of Dr. Heitjan and Dr. Peura. Dr. Goldfarb admitted to some mistakes which are detailed in paragraphs 21-25 below.

21.    Dr. Goldfarb admitted that at least two of the patients he identified as having clinically significant electrolyte shifts caused by SUPREP in the 303 study never took SUPREP. Tr. 387:16-22 (Goldfarb Cross).

22.    Dr. Goldfarb testified that Patient 4001 in the 303 study had a potassium shift caused by SUPREP. Tr. 383:23-384:2 (Goldfarb Cross). During the 303 study, Patient 4001 took

7

**A00000010**

NuLytely, a large volume, isotonic colon prep, but did not take SUPREP. Tr. 385:6-7 (Goldfarb

Cross); PTX454B at BRTSUP000124959. Dr. Goldfarb admitted that SUPREP did not cause the

electrolyte shift in Patient 4001. Tr. 385:8-10 (Goldfarb Cross).

23.    Dr. Goldfarb testified that Patient 4029 in the 303 study had a bicarbonate shift

caused by SUPREP. Tr. 386:17-19 (Goldfarb Cross). Patient 4029 took NuLytely, but did not take

SUPREP. Tr. 387:8-12 (Goldfarb Cross); PTX454B at BRTSUPOO 124959. Dr. Goldfarb

incorrectly concluded Patient 4029 had a bicarbonate shift caused by SUPREP. Tr. 387:13-14

(Goldfarb Cross).

24.    In addition to paragraph 18, the sample drawn from patient 4001 was grossly

hemolyzed. Tr. 385:17-386:6 (Goldfarb Cross); PTX454B at BRTSUP00124972. Dr. Goldfarb

admitted that the measurements for Patient 4001 were questionable because the sample was

hemolyzed. Tr. 386:13-15 (Goldfarb Cross).

25.    In addition, Dr. Goldfarb made other errors in the 202 and 301 studies.  See, cross-

examination of Dr. Goldfarb, Tr. 390:1-415:20.

26.    Novel argues that Goldfarb's mistakes were unintentional and did not undermine

his substantive findings.  Novel argues:

> On direct, Dr. Goldfarb testified that 18 out of 18 (100%) patients
> exhibited outside-of-normal range shifts in the 202 Study, 80 out of 180
> (44%) patients exhibited outside-of-normal range shifts in the 302 Study,
> and 20 out of 63 (32%) patients exhibited outside-of-normal range shifts
> in the 303 Study. Tr. at 325:4-17, 330:9-18, 352: 17-353: 1. Dr. Goldfarb
> was the only expert to have actually reviewed the thousands of pages of
> clinical trial data in this case. Tr. at 382:17-19. In doing so, Dr. Goldfarb
> made three mistakes in summarizing the data associated with two patients
> from the 303 Study and one patient from the 301 Study. Dr. Goldfarb
> never intended to mislead the Court (Tr. at 435:9-15), and while
> unfortunate, his mistakes should not cast doubt on the fact that SUPREP
> administration caused abnormal shifts. Indeed, Dr. Goldfarb's testimony,

A00000011

> aside from the three inadvertent mistakes, was unrebutted by either of
> Braintree's experts.

Novel Br. at 30 n.9.

27.    The Court rejects Novel's argument (paragraph 26) concerning Goldfarb's testimony because the inconsistencies demonstrated a lack of a thorough analysis of the data presented in the clinical trials.  As such, the Court gave little weight to Goldfarb's testimony compared to Heitjan and Peura.

28.    Dr. Sconzo testified in a credible manner. His testimony concerned a practitioner's viewpoint.  That is, Dr. Sconzo "never discusses issues concerning bowel prep choice with his patients in the context of mean data." Tr. 262:25-263:1, 263:3-8. Instead, Dr. Sconzo testified that he "looks at individual patients within the general patient population." Novel Br. at 9. Despite the testimony, the Court cannot rely on a practitioner who cannot give substantive testimony on the electrolyte shifts within a patient. The Court gives little weight to Dr. Sconzo's testimony.

29.    Dr. Peura's testimony was credible except for on one point. That is, Dr. Peura testified that he did not know of any untoward effects from the use of SUPREP; however, Dr. Peura admitted that he did not research the Med Watch section of the FDA website, nor did he inquire of Braintree whether there were any adverse effect reports.

30.    When Dr. Peura testified, I did not admit DTX715, but the parties agreed to a more limited proffer.  The parties entered a stipulation into evidence as exhibit DTX715.  The stipulation reads:

> Plaintiff Braintree Laboratories, Inc. and Defendant Novel
> Laboratories, Inc. have met and conferred regarding DTX707,
> DTX708, DTX709, DTX710, and DTX715. The parties hereby
> stipulate, subject to the Court's approval, to the following:

> Defendant Novel Laboratories, Inc. and Plaintiff Braintree
> Laboratories, Inc. hereby stipulate to the admissibility of
> DTX715 for the limited purpose of showing that the reports
> contained in DTX7 I 5 were filed with the United States Food
> and Drug Administration, are kept on file with FDA, and are
> available to the public through FOIA request. DTX715
> (bearing the Bates range NOV00l1047-77) contains the pages
> corresponding to the following exhibits, marked separately for
> identification at trial as: DTX707 (NOV0011066-67),
> DTX708 (NOV00l1074-77), DTX709(NOV0011053-55),
> and DTX710(NOVOl1067-68). Novel withdraws its offer of
> DTX707, DTX708, DTX709, and DTX710.

31.    Based on Dr. Peura's unfamiliarity with the Med Watch report and his failure to

ask Braintree about untoward effects, his testimony regarding same is suspect. This broad

statement of not being aware of any untoward effects of SUPREP on patients is incredulous since

he did not perform any research.  Except for this point, the Court found Dr. Peura to be a credible

witness.  However, the untoward effects argument raised by Novel in its cross-examination of Dr.

Peura had no effect on the outcome of this hearing because it was not evidence of clinically

significant electrolyte changes in the patient population.  Anecdotal evidence is of little relevance.

Mean v. Percentage

32.    Dr. Heitjan, a biostatistician, insists that the best approach to answer the Federal

Circuit's query regarding whether the patient population had alteration of electrolytes outside the

normal range is to utilize a means analysis.

33.    According to Dr. Heitjan, a means analysis is a standard or fundamental approach

to address patient population inquiries, and it is the most basic concept he teaches to his students.

(Tr. 45:12-17).  Dr. Heitjan stated:

> Well, in statistics we have lots of tools for conducting different kinds
> of analyses, for answering different kinds of questions. So we're
> always looking for the right tool that will answer the question that's

A00000013

being specified. And that's relevant here because the Circuit Court has been very specific about saying what kind of analysis needs to be done, that is looking for clinically significant shifts referring to shifts outside of the normal range in a particular population. So those directives lead me as a statistician specifically to analyze means looking at changes in the means.

34.    Novel's approach is different from Dr. Heitjan's methodology. Novel argues that the Federal Circuit requires a percentage approach to determine if there are clinically significant electrolyte shifts. That is, to determine the percentage of the patient population that are not within the normal range of electrolyte levels. This is accomplished by inserting numerical factors into the following formula:

$$\frac{\text{The number of patients outside of normal range}}{\text{Patient Population}}$$

Novel's argument relies on the text of Federal Circuit opinion. Novel argues:

> There is not a single instance in the Federal Circuit decision where the Court mandates that use of "mean" or "average" data to measure clinically significant electrolyte shifts in a patient population. Tr. 54:22-25. In fact, the opposite is true. All three members of the appellate panel addressed the issue of clinically significant electrolyte shifts in the context of percentage of patients, not a mean analysis. In the majority opinion, Judge Prost referenced "a large percentage of patients" -- not an "average" of the entire patient population as Braintree's experts now posit-when describing the absurdity of Braintree's initial proposed construct on for a patient as meaning "one or more." *Braintree Labs.*, 749 F.3d at 1357. Likewise, Judge Dyk, in his concurrence/dissent, referenced "the percentage of individuals experiencing such electrolyte shifts," "a majority of patients," and "a significant minority or about one-third of patients" when discussing measurement of electrolyte shifts. *Braintree Labs.*, 749 F.3d at 1361 n.1. Finally, in dissent, event Judge Moore characterizes clinically significant electrolyte shifts as occurring in a "percentage of people," a "statistically significant number of people" or a "majority" not in a mean or average of the entire patient population taking SUPREP as Braintree's experts would have this Court believe. *Id.* at 1367, n.3

Dr. Goldfarb's opinion was of concern.    He noted that a major fraction of hundreds of

A00000014

patients demonstrated the existence of clinically significant electrolyte shifts; however on cross-examination he stated that a major fraction is a "qualitative" number. (Tr. 431:21-433:24). The use of the word "qualitative" gave rise to the question about whether the percentage analysis was valid because it may vary among POSITAs. As such, the opinion of Dr. Goldfarb was given less weight.

35.     In addition, Novel relied upon Dr. Goldfarb's testimony and who Novel argues that his testimony is in accordance with FDA analysis. Dr. Goldfarb opined that percentage analysis was more appropriate. Novel noted:

> Importantly, FDA findings corroborate Dr. Goldfarb's opinion that SUPREP produces clinically significant electrolyte shifts in a significant portion of the general class of persons to whom the '149 patented invention is directed. FDA reviewers were "particularly attentive to the impact of SUPREP on fluid and electrolyte disturbances." DTX675 at FDACDER00026. That means that "since everyone understands that hypertonic bowel preps are associated with changes in the balance of electrolytes and lead to these kinds of clinically significant effects, the inventors, the investigators, and the FDA were all going to pay attention to the effect of SUPREP on fluids and electrolytes." Tr. 340:14-23. "The specific abnormalities of interest included low serum bicarbonate, high BUN, high creatinine, high uric acid, high magnesium, and high/low chloride, sodium, potassium, phosphate and osmolality." DTX675 at FDACDER00027. The FDA's approach of evaluating SUPREP's effect on electrolytes and blood chemistry is that the '149 patent inventors and Dr. Goldfarb took, and inconsistent with the approach of Dr. Heitjan's and Peura. [Tr. 341:6-13.]

36.     Despite Novel's argument that the Federal Circuit mandated the percentage approach, Dr. Heitjan states that the issue presented concerns a patient population and requires a mean analysis. He noted:

> Right. So the Circuit Court is saying you need to look not at a patient, but at the patient population. The second element of what they're saying is you need to look for clinically significant differences which would be effects of moving, you know, shifts outside of the normal range. So I interpret that as saying well, we

12

**A00000015**

need to look at the mean because that's the parameter that's relevant to the population. So we see if the means shift outside of the normal range. Tr. 55:14-22.

37.     The testimony of Dr. Heitjan and Dr. Peura demonstrated that the percentage omits factors which the mean analysis considers. For instance, the percentage approach does not measure variability of the patient population, but the means approach does so.

38.     Dr. Heitjan explained variability. When an individual characteristic, such as electrolyte level is measured, there is variability. Heitjan, as a biostatistician, describes this as "between-subject" and "within-subject" variability. "Between subject" variability refers to differences in measurements between different people. "Within subject" variability refers to differences in measurements taken from one individual over time. Tr. 42:6-44:2 (Heitjan Direct).

39.     Dr. Peura agreed with Dr. Heitjan's variability argument for several similar reasons. Dr. Peura testified that variability may affect electrolyte levels in terms of intrinsic, extrinsic and analytic variables. Tr. 171:20-172:14 (Peura Direct).

40.     Intrinsic factors that can affect electrolyte levels include age, gender, exercise, ethnicity, and whether the patient is using other drugs. Tr. 172:15-173:6; 178:13-180:9 (Peura Direct); PTX396; PDX12-9 (Peura Slides). Extrinsic factors that can affect electrolyte levels include fasting, dehydration, time of blood draw, stress, and hyperventilation. These factors are present in the context of colonoscopy preps. Tr. 173:7-174:7 (Peura Direct); PDX12-10 (Peura Slides).

41.     Dr. Peura testified that extrinsic and intrinsic factors may result in a biologic variation. For example, if blood is drawn from a person once a week for ten weeks and an analyte is measured in each blood draw, it is unlikely that all ten values would be the same. As a result, the mean approach considers such variability accruing due to the number of blood draws.

13

Tr. 182:11-16 (Peura Direct); PTX397 ("Clinical Chemistry") at 6-7.

42.    As noted in paragraph 39 above, analytic factors may also affect electrolyte levels. Such analytic factors include human error, equipment variability, exposure to ambient air, hemolysis, and the length of time that a blood sample sits before analysis. Dr. Heitjan refers to this concept as "measurement error," which can cause "within subject" variability. Tr. 174:8-175:11, 177:14-178:12; 181:23-182:10 (Peura Direct); 43:1-15 (Heitjan Direct); PTX395 ("Variation, Errors, and Quality in the Clinical Laboratory") at 3, 7; PTX397 ("Clinical Chemistry") at 6-7; PDX12-11 (Peura Slides).

43.    Based upon the credibility of Dr. Heitjan and Dr. Peura and the questionable credibility of Novel's experts, the Court finds the means approach is the best methodology to utilize. The primary reason for that finding are patient variability factors explained above.

44.    Dr. Heitjan testified about how he applied the means approach to clinical trials:

(a)    Dr. Heitjan calculated the percent of the subjects in each of the SUPREP clinical trials that had a pretreatment (or "baseline") value outside the normal range for any electrolyte. His results are presented in PTX482. In the BLI800-202 study, 44% of patients had at least one baseline serum electrolyte value outside the normal range. Baseline out-of-range results were about 30% in the BLI800-301 and 302 studies, and about 26% in the BLI800-303 study. These results show that it is common for a subject to have an electrolyte value outside the normal range without taking any colon prep, simply as a result of within-subject variability. PTX482 (All Studies Baseline Percentages); Tr. 64:17-66:13 (Heitjan Direct); PDX11-12 (Heitjan Slides).

(b)    Another way to evaluate the variability in subjects' electrolyte values before they take a colon prep is by analyzing the baseline data from the BLI800-202 study, which involved three separate blood draws before the patients took any colon prep. The data is summarized in

14

PTX481. It shows that patients' electrolyte values moved - including with respect to the normal range - during the three baseline measurements, even though the patients had not yet been administered SUPREP. This occurred in healthy patients as well as impaired patients. This data confirms that electrolyte values can move from inside to outside the range due to within-subject variability, unrelated to a prep. PTX481 (BLI800-202: Pre-Dose Electrolyte Levels); Tr. 67:3-71:19; PDX11-13 (Heitjan slides) (animation); PDX11-14 (Heitjan slides) (animation).

(c)     PTX481 shows how biologic and analytic variation can confound the interpretation of single patient blood values. Tr. 183:15-184:9 (Peura Direct); PTX481 (BLI800-202: Pre-Dose Electrolyte Levels).  Because the pre-dose blood levels vary within and between subjects, the individual data gleaned from the study may not give the full explanation of what is occurring in the patient population.

Means Approach

45.     According to Dr. Heitjan, the term "mean" refers to two related concepts. The first concept is the sample mean (average). That is, if you have ten subjects and you have a value for each subject, you can calculate the sample mean by adding the values for each subject and dividing by ten. The second concept is the population mean, which refers to the mean for the entire population. The sample mean is then used to estimate the population mean. Tr. 36:18-37:13 (Heitjan Direct) (emphasis added).

46.     According to Dr. Heitjan, clinical trials are conducted by drawing a representative sample from a population. You can measure a particular characteristic in the sample, such as an electrolyte level, and calculate the sample mean. The sample mean can be used to estimate the population mean. The larger the sample, the better the estimate of the population mean. Tr. 38:17-39:13 (Heitjan Direct); PDX11-4 (Heitjan Slides) (animation).

15

A00000018

47.    A "representative sample" refers to a sample in which no subset of the population – such as older people or men – are overrepresented. Tr. 39:14-20 (Heitjan Direct).

48.    Typically, the individual values for a particular variable, such as an electrolyte level, are concentrated in the middle of the distribution of values, with fewer observations toward the tails of the distribution, thereby creating a bell curve shape. The individual values aggregate around the mean. An effect on the population caused by a treatment is observed by a shift in the curve and the mean. The larger the shift in the mean, the greater the effect of the treatment. Tr. 37:19-38:13 (Heitjan Direct); PDX11-3 (Heitjan Slides).



mean before treatment

mean after treatment

49.    A confidence interval measures how precisely the sample mean estimates the population mean. It can be thought of as a range of likely values of the true population mean.

50.    A 95 percent confidence interval indicates that there is a 95 percent certainty that the true population mean is within the interval. Tr. 39:21-41:3 (Heitjan Direct); PDX11-5

16

A00000019

(Heitjan Slides). Dr. Heitjan removed several individual subjects from the top and bottom of the sample to reach the confidence interval.

51.     The confidence interval is normally depicted with bars extending out from the mean, where the "width" of the confidence interval refers to the distance from the bottom to the top of the line. The confidence interval widens as the variability of the data increases, and narrows as the sample size increases. Tr. 41:4-42:4 (Heitjan Direct); PDX11-5 (Heitjan Slides).

52.     The electrolytes that are measured in the blood are bicarbonate, calcium, chloride, magnesium, phosphorus, potassium, and sodium. Tr. 159:7-20 (Peura Direct); PTX490, at 439, Appendix C (FDA Manual); see also Tr. 410:3-6, 409:14-16 (Goldfarb Cross).

53.     The analytes listed in the "Enzymes" and "Other" categories of the Investigations Operations Manual are not electrolytes. Tr. 159:7-23 (Peura Direct); PTX490, at 439, Appendix C (FDA Manual); Tr. 410:11-411:20 (Goldfarb Cross).

54.     Dr. Heitjan conducted a means analysis of the electrolyte data from the SUPREP clinical trials. These materials included data files provided to Braintree directly by the laboratories that conducted the testing. Dr. Heitjan received data files in various formats, including SAS (the format used by the FDA) and Excel. The data files that Dr. Heitjan received were provided to the Court as PTX432. Dr. Heitjan also received data handling guidelines (PTX430) describing how Braintree handled routine data issues that arose during clinical trials. Dr. Heitjan testified that any biostatistician could have conducted the same analysis that he conducted using the data on PTX432. Tr. 88:18- 89:15 (Heitjan Direct); 114:4-13 (Heitjan Cross); 134:11-135:14, 139:9-21 (Heitjan Re-Direct); PTX432 (data disk); PTX430 (data handling guidelines)

A00000020

55.     Dr. Heitjan analyzed clinical trial data in the patients who took SUPREP for the seven electrolytes measured in blood serum in the SUPREP clinical trials: bicarbonate, calcium, chloride, magnesium, phosphate, potassium, and sodium. Tr. 57:1-6 (Heitjan Direct).

56.     Dr. Heitjan found that, after administration of SUPREP, none of the mean serum electrolyte levels in any of the SUPREP clinical trials fell outside the upper or lower limits of the normal range for any of the seven electrolytes. The means changed little from before to after administration of SUPREP in each of the trials. Tr. 34:6-17 (Heitjan Direct); PTX483 (Heitjan SUPREP Analysis); PDX11-15 through 11-50 (Heitjan Slides).

57.     For BLI800-301, Dr. Heitjan calculated the means and 95% confidence intervals for the sample population who took SUPREP for bicarbonate, calcium, chloride, magnesium, phosphate, potassium, and sodium levels. He made these calculations at baseline, at the colonoscopy time point a few hours after administration of SUPREP, and at the follow-up time point 30 days later. The means barely changed at all between these three time points for each electrolyte, and did not approach the outer limits of the normal range. Tr. 72:8-75:23 (Heitjan Direct); PTX483 (Heitjan SUPREP Analysis) at 8-14; PDX11-15 through 11-21 (Heitjan Slides).

58.     For BLI800-302, Dr. Heitjan conducted the same analysis as for BLI800-301. As in the 301 results, the means barely changed at all between the three time-points for each electrolyte, and did not approach the outer limits of the normal range. Tr. 75:24-77:14 (Heitjan Direct); PTX483 (Heitjan SUPREP Analysis) at 15-21; PDX11-22 through 11-28 (Heitjan Slides); see also Tr. 348:18-25, 351:1-5 (Goldfarb Direct).

59.     For BLI800-303, Dr. Heitjan analyzed the two time points that were collected in the study (baseline and colonoscopy). As in the 301 and 302 results, the means barely changed at

A00000021

all between the time points for each electrolyte, and did not approach the outer limits of the normal range. Tr. 77:15-79:11 (Heitjan Direct); PTX483 (Heitjan SUPREP Analysis) at 22-28; PDX11-29 through 11-35 (Heitjan Slides).

60. Dr. Heitjan combined the data from the BLI800-301, 302, and 303 studies because these studies had similar eligibility requirements, and the larger sample size more precisely estimates the population mean. Dr. Heitjan calculated means and 95% confidence intervals for that combined data. The means barely changed between the time points for each electrolyte, and did not approach the outer limits of the normal range. Tr. 79:12-82:9 (Heitjan Direct); PTX483 (Heitjan Analysis) at 29-35; PDX11-36 through 11-42 (Heitjan Slides).

**Bicarbonate:**



Case 3:11-cv-01341-PGS-LHG   Document 461   Filed 06/01/15   Page 20 of 26 PageID: 29851

**Sodium:**



**Calcium:**



20

**Chloride:**



**Magnesium:**



**A00000024**

**Phosphate:**



**Potassium:**



A00000025

61.     For BLI800-202, Dr. Heitjan conducted the same analysis as for the BLI800-301, 302, and 303. The 202 study involved multiple blood draws after each administration of SUPREP, and Dr. Heitjan used all time points, as well as the last baseline time point. The confidence interval in the 202 study was somewhat larger than those in the 301, 302, and 303 studies because of the smaller sample size. However, the means in the 202 changed very little between the different time points for each electrolyte, and did not approach the outer limits of the normal range. Tr. 83:13-87:10 (Heitjan Direct); PTX483 (Heitjan SUPREP Analysis) at 1-7; PDX11-44 through 11-50 (Heitjan Slides).

62.     The results of Dr. Heitjan's means analysis show that SUPREP did not produce any clinically significant electrolyte shifts in the patient population under the Federal Circuit's claim constructions. Tr. 73:20-74:1; 75:15-20; 76:9-14; 77:8-10; 78:11-17; 79:7-11; 80:15-20; 82:2-9, 85:13-17; 87:2-10 (Heitjan Direct); Tr. 187:25-189:23 (Peura Direct); PTX483 (Heitjan SUPREP Analysis); PDX11-15 through 11-50 (Heitjan Slides).

63.     During the original trial, the deletion of phosphate from the colonoscopy preparation was an important safety factor in developing the invention while maintaining efficiency. Dr. Heitjan showed those results.

64.     The mean phosphate data for Visicol shows Visicol's profound effect on mean phosphate levels, which moved outside the normal range after administration of the drug. PTX1 ('149 Patent) at 2:40-47; PTX431 (Visicol PDR Entry); PDX11-51 (Heitjan Slides); Tr. 90:17-93:1, 94:15-16 (Heitjan Direct), 191:2-22 (Peura Direct).

65.     Dr. Heitjan graphed mean phosphate levels for Phospho-soda based on data from DiPalma 1996 (PTX393). The data shows that Phospho-soda had a profound effect on the mean levels of phosphate, leading to movement of the mean outside the normal range. PDX11-52

23

(Heitjan Slides); Tr. 93:5-94:14 (Heitjan Direct).

66.    The mean phosphate data for Visicol and Phospho-soda show that these products produced clinically significant electrolyte shifts in the patient population – the kinds of clinically significant electrolyte shifts in the patient population that the inventors of the '149 patent sought to avoid with their invention. PTX431 (Visicol PDR Entry); PDX11-51, 11-52 (Heitjan Slides); Tr. 91:24-92:9; 94:9-14 (Heitjan Direct); 191:2-22 (Peura Direct), 568:25-569:15 (Peura Rebuttal Direct); PTX001 ('149 patent) at 2:40-47.

67.    A comparison of the mean data from DiPalma 1996[1] and from BLI800-202 shows that Phospho-soda had a profound effect on serum phosphate, while SUPREP had a negligible effect, if any. While the mean moved far outside the range after Phospho-soda administration, it remained within the normal range after SUPREP administration. This comparison makes clear that SUPREP does not cause clinically significant electrolyte shifts in the patient population. PDX11-53 (Heitjan Slides); Tr. 94:17-95:11 (Heitjan Direct); 191:2-22 (Peura Direct).

## CONCLUSIONS OF LAW

Infringement

68.    Novel's proposed product is identical or "equivalent" to Braintree's SUPREP except for the flavoring. PFOF ¶¶41-42; ECF No. 261 (SJ Op.) at 6. Thus, assuming SUPREP meets the limitations of claims 15 and 18, then Novel's proposed copy infringes those claims. ECF No. 261 (SJ Op.) at 9-10. Utilizing Heitjan's analysis, SUPREP meets each and every limitation of claims 15 and 18. PFOF ¶¶59-171. As a result, Novel's "equivalent" of SUPREP will, if marketed and sold, infringe claims 15 and 18.

---

[1]    The results of the BLI800-303 study were described in a 2010 article by Douglas K. Rex, et al. PTX394 ("Rex 2010"); Tr. 60:20-22 (Heitjan Direct).

24

**A00000027**

69.     Finally, Novel will induce infringement of claims 19, 20, and 23, which claim methods for using the compositions of claims 15 and 18. Novel's proposed copy of SUPREP meets each and every limitation of claims 15 and 18. See PFOF ¶¶59-171. Since Novel did not appeal this Court's finding relevant to inducement, there is no reason to change that ruling now. Fed. Cir. Appeal, ECF Nos. 16, 33.

70.     Novel's post-trial brief (ECF No. 452) focuses on Braintree's failure to show infringement because of a laundry list of items. From the Court's view, Braintree must prove infringement by a preponderance of the evidence. The Federal Circuit limited the inquiry to whether any clinically significant electrolyte shifts occurred. Here, through the testimony of Dr. Peura and Dr. Heitjan, Braintree has met the burden of proof.

Miscellaneous

71.     Novel seeks to sanction Braintree for failure to provide adverse event reports concerning SUPREP administration. Fed. R. Civ. P. 37. Novel argues that "the appropriate sanction for Braintree's failure to produce those documents should be an adverse inference that untoward effects are present in patients to SUPREP has been administered." (Novel Br. (ECF No. 453) at 29.)

72.     The Court finds the failure to provide the adverse event reports to be a minor issue that does not require the imposition of an adverse inference. Novel has not shown any prejudice, surprise, or bad faith on the part of Braintree. *See In Re Mercedes*, 225 F.R.D. 498, 506 (D.N.J. 2005). Moreover, such a sanction at this time after a trial and a factual hearing having been completed would constitute a significant but unwarranted disruption to the trial findings. Novel's motion to impose sanctions is denied. The attorneys for the parties conducted themselves professionally and cooperatively during the litigation, and both should be commended for same.

25

**A00000028**

## CONCLUSION

The Court finds that Braintree has proved infringement by the preponderance of the evidence. Novel's proposed copy of SUPREP meets each and every limitation of claims 15 and 18, and will therefore infringe upon these claims if marketed and sold. Novel's proposed copy of SUPREP will also induce infringement of claims 19, 20, and 23, which claim methods for using the compositions of claims 15 and 18. Novel's request for an adverse inference is denied. An order will follow.

Dated:  June 1, 2015

_____
PETER G. SHERIDAN, U.S.D.J.

US006946149B2

(12) **United States Patent**
    Cleveland

(10) **Patent No.:**      **US 6,946,149 B2**
(45) **Date of Patent:**      **Sep. 20, 2005**

(54) **SALT SOLUTION FOR COLON CLEANSING**

(75) Inventor:   **Mark vB. Cleveland**, Duxbury, MA (US)

(73) Assignee:   **Braintree Laboratories, Inc.**, Braintree, MA (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 311 days.

(21) Appl. No.: **10/135,857**

(22) Filed:   **Apr. 30, 2002**

(65)        **Prior Publication Data**

    US 2003/0202957 A1 Oct. 30, 2003

(51) Int. Cl.$^7$ ..................... **A61K 33/04**; A61K 31/045; A61K 31/075; A61K 33/00

(52) **U.S. Cl.** ..................... **424/709**; 424/713; 514/723; 514/738; 514/892

(58) **Field of Search** ................................ 424/709, 713; 514/723, 738, 892

(56)        **References Cited**

        U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,975,286 A | * | 12/1990 | Hechter | 424/682 |
| 5,077,048 A | * | 12/1991 | Kimura et al. | 424/422 |
| 5,124,144 A | * | 6/1992 | Giorgetti et al. | 424/78.01 |
| 5,197,950 A | | 3/1993 | Clayton | 604/28 |
| 5,616,346 A | | 4/1997 | Aronchick | |
| 5,710,183 A | | 1/1998 | Halow | 514/892 |
| 5,997,906 A | | 12/1999 | Wood et al. | |
| 6,162,464 A | | 12/2000 | Jacob et al. | |
| 6,235,745 B1 | * | 5/2001 | Megens | 514/272 |

        OTHER PUBLICATIONS

STN/CAS online, file TOXCENTER, Acc. No. 2002:312828 (Antioquia Med. (1972) 22 (9–10), pp. 699–704), Abstract.*
See STN/CAS online, file CAPLUS, Acc. No. 1980:99549 (Majallah—Daneshgah–e Tehran, Daneshkade–e Darusazi (1976), (Feb.), pp. 28–41), Abstract.*
Martindale (28th Ed. 1982), pp. 626–629,632,643.*
Drug Facts and Comparisons (1994), pp. 1710–1713.*
Adams, et al., "Bisacodyl Reduces the Volume of Polyethylene Glycol Solution Required for Bowel Preparation", Colorectal Unit, St. George Hospital, Sydney, Australia, Dis Colon Rectum, pp. 229–235 (1994).
Bokemeyer, "Koloskopievorbereitung im der ambulanten Gastroenterologis", *Verdauungskrankheiten*, pp. 17–24 (2000).
Brady, et al., "Effect of Bisacodyl on Gut Lavage Cleansing For Colonoscopy", *Annals of Clinical Research*, vol. 19, pp. 34–38 (1987).
Clarkston, et al., "The Use of GoLYTELY and Dulcolax in Combination in Outpatient Colonoscopy", *J. Clin Gastroenternol*, vol. 17(2), pp. 146–148 (1993).
Grundel, et al., "Improvements in Mechanical Bowel Preparation for Elective Colorectal Surgery", *Dis Colon Rectum*, vol. 40(11), pp. 1348–1352 (1997).

Lind, et al., "Peroral emptying of the colon. A Randomized comparison of 4 and 1.5 liter regimens", Tidssky Nor Laegenforen, vol. 110(11), pp. 1357–1358, (1990).
Sharma, et al., "Prospective, randomized, controlled comparison of the use of polyethylene glycol electrolyte lavage solution in four–liter versus two–liter volumes and pretreatment with either magnesium citrate or bisacodyl for colonoscopy preparation", *Gastrointestinal Endoscopy*, vol. 47(2), pp. 167–171 (1998).
Villien, et al., "Golytely Preparation for Colonoscopy: 1.5 Liters is Enough for Outpatients", *Endoscopy*, vol. 22, pp. 168–170 (1990).
"Safety of Sodium Phosphates Oral Solution" Sep. 17, 2001, Food and Drug Administration Science Background, U.S. Food & Drug Administration, Center for Drug Evaluation and Research.
InKine Pharmaceutical Company, Inc. package insert 2000, Visicol Tablets.
Chan, A., et al., Use of Oral Sodium Phosphate Colonic Lavage Solution by Canadian Colonscopists: Pitfalls and Complications, Canadian Journal of Gastroenterology, May/Jun. 1997, 334–338, vol. 11, No. 4, Queen's University, Kingston, Ontario, Canada.
Ahmed, M., et al., Oral Sodium Phosphate Catharsis and Acute Renal Failure, American Journal of Gastroenterology, Jun. 1996, 1261–1262, vol. 91, No. 6, Catholic Medical Center of Brooklyn Queens, Inc., Jamaica, New York, USA.
Dipalma, Ja., et al., Biochemical Effects of Oral Sodium Phosphate, Digestive Diseases and Sciences, Apr. 1996, 749–753, vol. 41, No. 4, Picnum Publishing Corporation, Mobile, Alabama, USA.
Kolts, Byron E., M.D., F.A.C.P., et al., A Comparison of the Effectiveness and Patient Tolerance of Oral Sodium Phosphate, Castor Oil, and Standard Electrolyte Lavage for Colonoscopy or Sigmoidoscopy Preparation, American Journal of Gastroenterology, Aug. 1993, 1218–1223, vol. 88, No. 8, University of Florida Health Science Center, Jacksonville, Florida, USA.

        (Continued)

*Primary Examiner*—S. Mark Clardy
*Assistant Examiner*—Frank I. Choi
(74) *Attorney, Agent, or Firm*—Wilmer Cutler Pickering Hale and Dorr LLP

(57)        **ABSTRACT**

The field of colonic diagnostic and surgical procedures is hampered by the lack of optimal means available to cleanse the colon. A compromise between convenient, distasteful, solid or low volume, hyperosmotic solutions which cause considerable fluid and electrolyte imbalances in patients and large volume, difficult to consume, iso-osmotic solutions has had to be made heretofore. This invention describes a low volume, hyper-osmotic solution consisting of sulfate salts with and with out polyethylene glycol. Unlike prior art, this composition is useful for the cleansing of the bowel and, in lower volumes, as a laxative, without producing clinically significant changes in bodily function.

**23 Claims, No Drawings**

A00000030

**US 6,946,149 B2**

Page 2

### OTHER PUBLICATIONS

Vanner, SJ., et al., A Randomized Prospective Trial Comparing Oral Sodium Phophate with Standard Polyethylene glycol–based lavage solution (Golytely) in the Preparation of Patients for Colonoscopy, American Journal of Gastroenterology, Apr. 1990, 422–427, vol. 85, No. 4, Queen's University, Kingston, Ontario, Canada.

Davis, Gr., et al., Development of a Lavage Solution Associated with Minimal Water and Electrolyte Absorption or Secretion, Gastroenterology, May 1980, 991–995, vol. 78, Baylor University Medical Center, Dallas, Texas, USA.

* cited by examiner

US 6,946,149 B2

| 1 | 2 |

# SALT SOLUTION FOR COLON CLEANSING

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

I have found a new improved concentrated colonic purgative formulation made by combining inorganic salts and polyethylene glycol (PEG) in a small volume of water. This formulation is effective to produce colonic purging to prepare the colon for surgical or diagnostic procedures and surprisingly does not cause clinically significant changes in electrolyte balance.

### 2. Background Information

In sigmoidoscopy, colonoscopy, radiographic examination, preparation of patients undergoing bowel surgery, and other medical or diagnostic procedures on the colon, it is important that the colon be thoroughly purged and cleaned. In particular, it is essential that as much fecal matter as possible be removed from the colon to permit adequate visualization of the intestinal mucosa. This is important prior to, for example, diagnostic procedures such as flexible sigmoidoscopy or colonoscopy, diagnostic examinations widely performed to screen patients for diseases of the colon. In addition, it is important that the intestines be cleansed thoroughly in order to obtain satisfactory radiographs of the colon. The same condition also applies when the colon is preoperatively prepared for surgery, where removal of fecal waste materials is critically important for patient safety.

Large volume orally administered compositions have been developed for use as gastrointestinal washes for diagnostic purposes or for use as cathartic laxatives. Such orally administered preparations are usually formulated as dilute or isotonic solutions of electrolytes such as sodium sulfate, sodium bicarbonate, sodium chloride and potassium chloride. These orally administered compositions are useful in the rapid cleansing of the colon for diagnostic purposes. These formulations may include other agents such as polyethylene glycol. These formulations have generally been administered in a quantity of about four liters as isotonic solutions. One example composition is GoLYTELY® formulated according to the following: polyethylene glycol 59 g, sodium sulfate 5.68 g, sodium bicarbonate 1.69 g, sodium chloride 1.46 g, potassium chloride 0.745 g and water to make up one liter (Davis et al. Gastroenterology 1980;78:991–995).

Commercially available products embodying these formulations sometimes utilize polyethylene glycol, a non-absorbable osmotic agent, with an isotonic mixture of electrolytes for replenishment, so that patients do not become dehydrated or experience clinically significant electrolyte shifts. Because the solutions are isotonic, patients are required to ingest a significant amount of volume of these solutions, up to one eight ounce glass every ten minutes for a total of one gallon of fluid, to achieve effective purging

Sodium sulfate and phosphate salts have been used as laxatives when diluted in a small volume (~300 mL) concentrated solution and taken in tablespoon sized (15 ml) daily doses. An example of this use is Glauber's Salt's (containing sodium sulfate). However, because of their small volumes, when used in this fashion they do not sufficiently clean the colon for diagnostic or surgical procedures. Also these small volume preparations do not contain polyethylene glycol. Sodium sulfate combined with polyethylene glycol and various other salts, administered in large volumes (1 gallon) over a short period of time is an effective gastrointestinal lavage, which cleanses the colon prior to colonoscopy or surgical procedures as described above.

The large volume required for effective use of this type of formulation for lavage is frequently associated with distention, nausea, vomiting and significant patient discomfort. Thus, while these formulations are generally effective, they are not well tolerated.

Another drawback of these prior art preparations is their unpleasant, bitter, saline taste. This can promote nausea and vomiting in sensitive patients—thereby preventing ingestion. It is difficult to overcome this unpleasant taste, even the most common natural sweeteners such as glucose, fructose, saccharose, and sorbitol could change the osmolarity of these orally administered solutions resulting in potentially dangerous electrolyte imbalances.

In an attempt to avoid the problems associated with the high volume types of preparations, other investigators have utilized ingestible preparations which consist of aqueous solutions of concentrated phosphate salts. The aqueous phosphate salt concentrate produces a tremendous osmotic effect on the intra-luminal contents of the bowel and therefore, evacuation of the bowel occurs with a large influx of water and electrolytes into the colon from the body. These phosphate salt preparations have been developed for the purpose of decreasing the volume required in colonic purgations. One such preparation basically is comprised of 480 grams per liter monobasic sodium phosphate and 180 grams per liter dibasic sodium phosphate in stabilized buffered aqueous solution and is sold under the brand name Fleets Phospho-Soda.™. Patients are typically required to take two (2) three ounce doses of this preparation, separated by a three to 12 hour interval for a total of six ounces (180 ml), which is a significant reduction compared to the large 1 gallon volumes required by the high volume preparations. Additionally, non-aqueous tablet or capsule formulations of sodium phosphates and sulfates have been used (U.S. Pat. Nos. 5,997,906, 6,162,464, and 5,616,346).

These small volume sulfate/phosphate solutions and non-aqueous formulations have been shown to cause massive electrolyte and fluid shifts that are clinically significant to the patient (US Food and Drug Administration, Center for Drug Evaluation and Research, Sep. 17, 2001; 2002 Physician's Desk Reference, prescribing information for Fleet's Phospho Soda and InKine Pharmaceutical's Visicol®). The terms "clinically significant" as used herein are meant to convey alterations in blood chemistry that are outside the normal upper or lower limits of their normal range or other untoward effects. These solutions are hyperosmotic; that is the electrolyte concentration of the solution is much higher than the electrolyte concentration in the human body. Available products, as Fleet's Phospho-Soda, and the solid dosage form such as Visicol tablets (sodium phosphate salts) are examples of small volume electrolyte preparations. All of these products have been seen to cause clinically significant electrolyte disturbances and fluid shifts, and disturbances in cardiac and renal function when administered to patients (US Food and Drug Administration, Center for Drug Evaluation and Research, Sep. 17, 2001).

To overcome the risks and electrolyte disturbances that occur with the small volume laxative preparations, large volume "lavage" solutions were developed to be isotonic. Preparing a patient for a surgical or diagnostic procedure on the colon with such an isotonic lavage would result in only minimal fluid and electrolyte shifts in the patient.

A00000032

US 6,946,149 B2

**3**

GoLytely®, NuLytely®, and CoLyte® are examples of such large volume ravages. Because these lavages are isotonic, the patient experiences minimal, non-clinically significant fluid and electrolyte shifts, if any, upon their administration.

From the foregoing, it can be seen that the two approaches to colonic lavage have significant drawbacks that have not been resolved by prior attempts. The isotonic solutions, while not causing clinically significant fluid or electrolyte shifts, are, of necessity, of large volume, and difficult for patient ingestion. The hypertonic solutions or concentrated non-aqueous formulations are sometimes inadequate to prepare the colon and more importantly, can cause clinically significant electrolyte and fluid shifts, which have been known to cause deaths. Thus, it is desirable to have a small volume orally administered colonic purgative formulation which may be easily and conveniently administered and which avoids the clinically significant problems and objectionable tastes of known formulations. It can also be seen that it is desirable to have such a purgative formulation which may be administered without the large volumes necessary in conventional formulations and which avoids other potentially irritant chemicals or chemicals which could effect osmolality. In the nearly 20 years since the advent of large volume colonic lavage solutions, there has not been success in discovering an effective small volume gastrointestinal cleansing preparation that minimized fluid or electrolyte shifts. Concentrating the large volume lavages into smaller volumes does not achieve the same effectiveness, and is not as safe. This is because the components are not soluble in the small volumes necessary and because the concentrations are such that dangerous electrolyte shifts could occur. One purpose of the present research was to develop a safe, effective, and well tolerated small volume solution made up of a high concentration of poorly absorbable salts that induce a colon cleansing catharsis after oral ingestion without clinically significant alternation of sodium, chloride, bicarbonate, potassium, calcium, and phosphate level and balance or other untoward effects on the recipient.

**SUMMARY OF THE INVENTION**

I now disclose easily and conveniently administered dosage formulations of effective colonic purgatives.

The disclosed colonic purgative formulations provide safe and effective purgative activity at lower dosages of salt than prior art sodium phosphate tablets, solutions of phosphates and sulfates, or combinations thereof. In addition, a lower volume of fluid is ingested and there are no clinically significant changes in body electrolyte chemistry.

This colonic purgative can be administered with a minimum amount of patient discomfort and is better tolerated than prior art purgatives.

The colonic purgative may include an effective amount of one or more sulfate salts, $Na_2SO_4$, $MgSO_4$, and $K_2SO_4$ have been used. Polyethylene glycol may also be advantageously added to the colonic purgative composition.

**DETAILED DESCRIPTION OF AN ILLUSTRATIVE EMBODIMENT**

There are two currently used methods used for colonic lavage. These are: (1) gastrointestinal lavage with 4 liters of a balanced solution that causes negligible net water or electrolyte absorption or secretion or (2) oral ingestion of small volumes of concentrated (hypertonic) sulfate or sodium phosphate solutions, e.g. Fleet Phospho-Soda, or the non-aqueous tablet formulations of phosphates or salts, all of which cause clinically significant effects on bodily chemistry.

**4**

Clinical trials have shown use of the 4 liter balanced solution to be safe and efficacious. However, compliance is poor because of the large volume of solution that must be rapidly ingested. Additionally, these large volume solutions are not well tolerated by patients.

Use of the hypertonic sodium phosphate solutions is also efficacious in cleansing the colon. However, use of hypertonic sodium phosphate has been shown to cause upset in electrolyte balance including: hyperphosphatemia, hypocalcemia, positive sodium balance, and negative potassium balance. For example, in one published study the average serum phosphate concentration rose from 2.8 to 6.5 mg/dL (Kolts et al., Am. J. Gastroenterology, 88:1218–1223, 1993), and in another some patients developed serum phosphate concentrations as high as 11.6 mg/dL (Vanner et al., Am. J. Gastroenterology 85:422–427, 1990). The normal range for serum phosphate is generally considered to be 2.6 to 4.5 mg/dL. Also, serum potassium fell to as low as 2.9 mEq/L, while the normal range is 3.4 to 5.4. In a third published study, the Ca×P product rose from 35 to as high as 104, while the normal range is generally 22–47 (DiPalma et al., Digestive Diseases and Sciences, 41:749–753, 1996).

Hypertonic phosphate gastrointestinal cleansing solutions have also been associated with hypokalemia and hypocalcemia in some patients, resulting in serious injury and even death (Ahmed et al. Am. J. Gastro. 1998;91:1261–1262).

While Fleet Phospho-Soda preparation, and other hypertonic phosphate colonic lavages are generally considered safe for most healthy adults, they pose significant risks for adverse reactions in patients with renal, cardiac or hepatic diseases, and elderly patients in whom excess sodium absorption might be dangerous. Because of these risks of severe adverse reactions, renal and cardiac function should be evaluated and serum phosphate and serum calcium should be carefully monitored in all patients using hypertonic phosphate gastric lavage composition (Fleet and Visicol labeling). This monitoring is inconvenient, adds to expense and is infrequently performed resulting in dangerous incidents (Chan et al. Can. J. Gastro 1997; 11:334–338).

I have found a safe and effective small volume colonic purgative formulation that avoids the problems of the prior art, using poorly absorbable sulfate salts with a small quantity of polyethylene glycol. In performing this research, my objective was to find a well tolerated orally administered colonic purgative that was as effective as the well known hypertonic phosphate ravages, that avoided the risks of upset of electrolyte balance in patients.

I have found that hypertonic solutions of non-phosphate salts are effective in producing colonic purgation. Addition of an osmotic laxative agent such as polyethylene glycol improves the results in improved purgation and reduces the amounts of salts required. Because it is administered in small volumes, these formulations are better tolerated than formulations now used. These formulations are as effective as colonic purgatives now used, with a lower risk of adverse reactions.

Mixtures of sulfate salts that omit phosphates (which are avidly absorbed) can be effective to produce colonic purgation. In particular, formulations comprising effective amounts of one or more of the following sulfate salts $Na_2SO_4$, $MgSO_4$, and $K_2SO_4$ are effective. Dosage amounts of $Na_2SO_4$ from about 0.01 g to about 40.0 g can be effective to produce purgation. Doses of from about 0.1 g to about 20.0 g may be advantageously used. Dosages of 1.0 to 10.0 g may be preferred. Dosage amounts of $MgSO_4$ from about 0.01 g to about 40.0 g can be effective to produce purgation.

**A00000033**

US 6,946,149 B2

5

Doses of from about 0.1 to about 20.0 g may be advantageously used. Dosages of 1.0 to 10.0 g may be preferred. Dosage amounts of $K_2SO_4$ from about 0.01 to about 20.0 g can be effective to produce purgation. Doses of from about 0.1 to about 10.0 g may be advantageously used. Dosages of about 0.5 to about 5.0 g may be preferred. The formulation is advantageously a mixture of the foregoing salts.

Addition of an osmotic laxative agent, such as polyethylene glycol (PEG) improves the effectiveness of the above salt mixtures. Doses of PEG from about 1.0 to about 100 g are effective to produce Taxation. Doses from about 10.0 g to about 50 g of PEG have been shown to be effective. A dose of about 34 g of PEG has been used.

For ease of administration, the above mixture of salts can be dissolved in a convenient volume of water. A volume of less than one liter of water is well tolerated by most patients. The mixture can be dissolved in any volume of water, and volumes of between 100 and 500 ml are often convenient. Any volume may be administered. Optimally, the effective dose may be divided and administered, to the patient in two, or more administrations over an appropriate time period. Generally, 2 doses administered of equal portions of the effective dose, separated by 6 to 24 hours produce satisfactory purgation.

EXAMPLES

Subjects were otherwise healthy adults between the ages of 18 and 55. There were no preferences or exclusions based on gender or ethnic background.

Dietary Preparation and Ingestion of Salt Solution

Each experiment began at midnight on the first day of a two day study period, and was completed at noon on the next day. The subjects did not consume any food or beverages after midnight on day 1. From 6 a.m. until 6 p.m. on day 1 the subjects consumed a clear liquid diet. Clear liquids included strained fruit juices without pulp (apple, white grape, lemonade), water, clear broth or bouillon, coffee or tea (without milk or non-dairy creamer), carbonated and non-carbonated soft drinks, Kool-Aid® (or other fruit flavored drinks), Jell-O® gelatin (without added fruits or toppings), and ice PopSicles® fruit bars. Solid foods, milk, and milk products are not allowed. The subjects kept a record of exactly what they consumed on day 1, and they were asked to consume the same liquids at the same time if and when they did subsequent studies with a different solution.

Subjects reported to the laboratory at 6 p.m. on day 1. At 7 p.m. they ingested the first dose of concentrated salt solution, either Fleet Phospho-Soda or the experimental solution, followed by 8 ounces of water. Eight ounces of water was also ingested at 8, 9, and 10 p.m.

At 5 a.m. on day 2, a second dose of the concentrated salt solution was ingested, followed by 8 ounces of water.

Formulation of Concentrated Salt Solutions:

Fleet Phospho-Soda (C. S. Fleet Co., Inc., Lynchburg, Va. 24506), 90 mL, was added to 240 mL of water, for a volume of 330 mL. One half of this diluted solution was ingested by the subjects on two occasions, at 7 p.m. on day 1 and again at 5 a.m. on day 2. Based on the manufacturer label, the 330 mL of ingested Phospho-Soda solution contained $NaH_2PO_4.H_2O$ (43.2 g) and $Na_2HPO_4.7H_2O$ (16.2 g).

The ingested experimental solutions were also 330 mL in volume, and their composition is shown in the tables below. All salts were obtained from Mallinckrodt (Paris, Ky. 40361) and Polyethylene glycol (PEG) was obtained from J.

6

T. Baker (Phillipsburg, N.J. 08865). One half of each experimental solution is ingested by the subjects on two occasions, at 7 p.m. on day 1 and at 5 a.m. on day 2.

TABLE 1

The dosage of ingested salts (mmoles) were as follows:

| | | Experimental Solutions | | | | |
|---|---|---|---|---|---|---|
| | Fleet | A | B | C | D | E |
| $NaH_2PO_4.H_2O$ | 313 | 0 | 0 | 157 | 0 | 0 |
| $Na_2HPO_4.7H_2O$ | 60 | 0 | 0 | 30 | 0 | 0 |
| $Na_2SO_4$ | 0 | 100 | 125 | 142.5 | 142.5 | 142.5 |
| $MgSO_4$ | 0 | 100 | 125 | 0 | 142.5 | 142.5 |
| $K_2SO_4$ | 0 | 0 | 12.5 | 23.75 | 23.75 | 20 |
| KCl | 0 | 5 | 0 | 0 | 0 | |
| $KHCO_3$ | 0 | 5 | 0 | 0 | 0 | |

TABLE 2

The concentration of the salts expressed in milliequivalents was:

| | | Experimental Solutions | | | | |
|---|---|---|---|---|---|---|
| | Fleet | A | B | C | D | E |
| Na | 433 | 200 | 250 | 502 | 285 | 285 |
| K | 0 | 10 | 25 | 48 | 48 | 40 |
| Mg | 0 | 200 | 250 | 0 | 285 | 285 |
| $SO_4$ | 0 | 400 | 525 | 333 | 618 | 610 |
| $PO_4$ | 11.6 | 0 | 0 | 5.8 | 0 | 0 |
| Cl | 0 | 5 | 0 | 0 | 0 | 0 |
| $HCO_3$ | 0 | 5 | 0 | 0 | 0 | 0 |

Solution E also contained 34 g of Polyethylene glycol (PEG).

Observations and Measurements:

Body weight was measured at 6:45 p.m. on day 1, and at noon on day 2. Blood pressure (lying and after standing for 30 seconds) was measured every two hours, starting at 6:45 p.m. on day 1 and finishing at 11:45 a.m. on day 2. Blood was drawn at 6:45 p.m. on day 1 and at 6 a.m., 8 a.m., 10 a.m. and 12 noon on day 2. Blood was analyzed for calcium, sulfate, magnesium, phosphate, sodium, chloride, potassium, bicarbonate, osmolality, albumin, total protein, BUN, creatinine, and hematocrit.

Each stool was quantitatively collected in separate containers and its weight and consistency were measured. The degree to which the stool contained fecal material was graded, using a scale from 0–5 (0 would be similar to urine, 5 would be a large amount of solid fecal material). Stools collected from 7 p.m. (day 1) until 5 a.m. (day 2) were pooled: this pool represents the effects of the first dose of salts. Stools collected from 5 a.m. until 12 noon were pooled: this pool represents the effect of the second dose of salts. The electrolyte composition of the two pooled specimens was measured (osmolality, Na, K, Cl, $HCO_3$, $PO_4$, $S_4$, Ca and Mg).

Urine was quantitatively collected from 6 a.m. until 6 p.m. on day 1 (prior to ingestion of salts), from 7 p.m. on day 1 until 5 a.m. on day 2, and from 5 a.m. on day 2 until 12 noon on day 2. Urine was analyzed for sulfate, phosphate, calcium, magnesium and monovalent electrolytes.

A00000034

US 6,946,149 B2

| 7 | 8 |
|---|---|

**Results**

Study results are shown in tables 3 and 4.

### TABLE 3

Fecal And Urine Analysis

| | Intake | FECAL Output | Change | URINE Output (mL) |
|---|---|---|---|---|
| Volume (mL) | | | | |
| Phospho-Soda Experimental Solution | 1530 | 2403 | −873 | 902 |
| A | 1530 | 1510 | 20 | 832 |
| B | 1530 | 2209 | −679 | 789 |
| C | 1530 | 1868 | −338 | 779 |
| D | 1530 | 2202 | −672 | 639 |
| E | 1530 | 2729 | −1199 | 780 |
| Sodium (mEq) | | | | |
| Phospho-Soda Experimental Solution | 437 | 397 | 40 | −80 |
| A | 200 | 198 | 2 | 89 |
| B | 200 | 302 | −102 | 109 |
| C | 502 | 360 | 142 | 169 |
| D | 285 | 331 | −46 | 132 |
| E | 285 | 369 | −84 | 95 |
| Potassium (mEq) | | | | |
| Phospho-Soda Experimental Solution | 0 | 54 | −54 | 29 |
| A | 10 | 30 | −20 | 19 |
| B | 20 | 41 | −21 | 21 |
| C | 48 | 34 | 14 | 44 |
| D | 48 | 44 | 4 | 28 |
| E | 40 | 42 | −2 | 24 |
| Chloride (mEq)) | | | | |
| Phospho-Soda Experimental Solution | 0 | 41 | −41 | 42 |
| A | 5 | 36 | −31 | 53 |
| B | 0 | 71 | −71 | 82 |
| C | 0 | 21 | −21 | 81 |
| D | 0 | 71 | −71 | 86 |
| E | 0 | 81 | −81 | 62 |
| Bicarbonate (mEq) | | | | |
| Phospho-Soda Experimental Solution | 0 | 19 | −19 | |
| A | 5 | 38 | −33 | 0 |
| B | 0 | 61 | −61 | 0 |
| C | 0 | 16 | −16 | 0 |
| D | 0 | 89 | −89 | 0 |
| E | 0 | 72 | −72 | 0.9 |
| Phosphorous (g) | | | | |
| Phospho-Soda Experimental Solution | 10.6 | 6.5 | 4.1 | 1.7 |
| A | 0 | 0.1 | −0.1 | 0.3 |
| B | 0 | 0.2 | −0.2 | 0.2 |
| C | 5.8 | 2.3 | 3.5 | 0.3 |
| D | 0 | ND | 0 | 0.4 |
| E | 0 | 0.13 | −0.1 | 0.3 |
| Calcium (mEq) | | | | |
| Phospho-Soda Experimental Solution | 0 | 5 | −5 | 1.7 |
| A | 0 | 9 | −9 | 7 |
| B | 0 | 11 | −11 | 5 |
| C | 0 | 3 | −3 | 3 |

### TABLE 3-continued

Fecal And Urine Analysis

| | Intake | FECAL Output | Change | URINE Output (mL) |
|---|---|---|---|---|
| D | 0 | 8 | −8 | 8 |
| E | 0 | 17 | −17 | 6 |
| Magnesium (mEq) | | | | |
| Phospho-Soda Experimental Solution | 0 | 9 | −9 | 1.8 |
| A | 200 | 156 | 44 | 6 |
| B | 200 | 193 | 7 | 5 |
| C | 0 | 3 | −3 | 2 |
| D | 285 | 187 | 98 | 7 |
| E | 285 | 239 | 46 | 7 |
| Sulfate (mEq) | | | | |
| Phospho-Soda Experimental Solution | 0 | 12 | −12 | 11 |
| A | 400 | 285 | 115 | 65 |
| B | 420 | 370 | 50 | 55 |
| C | 333 | 210 | 123 | 74 |
| D | 618 | 433 | 185 | 63 |
| E | 610 | 478 | 132 | 58 |
| PEG (g) | | | | |
| Phospho-Soda Experimental Solution | 0 | 0 | 0 | 0 |
| A | 0 | 0 | | |
| B | 0 | 0 | | 0 |
| C | 0 | 0 | | 0 |
| D | 0 | 0 | | 0 |
| E | 34 | 29.1 | | 4.9 |

### TABLE 4

Serum Electrolyte and Mineral Data

| | 645 PM | 600 AM | 800 AM | 10 AM | 1200 PM |
|---|---|---|---|---|---|
| Sodium (mEq/L) | | | | | |
| Phospho-Soda Experimental Solution | 138 | 141 | 142 | 143 | 143 |
| A | 138 | 139 | 140 | ND | ND |
| B | 140 | 142 | 141 | 142 | 142 |
| C | 141 | 142 | 144 | 144 | 144 |
| D | 136 | 139 | 138 | 138 | 138 |
| E | 140 | 141 | 142 | 141 | 142 |
| Potassium (mEq/L) | | | | | |
| Phospho-Soda Experimental Solution | 4.9 | 3.7 | 3.9 | 4.0 | 3.9 |
| A | 5.4 | 4.0 | 4.2 | ND | ND |
| B | 5.7 | 4.4 | 4.7 | 4.9 | 4.4 |
| C | 5.5 | 4.2 | 4.6 | 4.6 | 4.5 |
| D | 7.3 | 4.2 | 4.6 | 4.2 | 4.2 |
| E | 4.6 | 4.0 | 4.3 | 4.4 | 4.3 |
| Chloride (mEq/L)) | | | | | |
| Phospho-Soda Experimental Solution | 103 | 105 | 107 | 107 | 107 |
| A | 107 | 104 | 106 | ND | ND |
| B | 107 | 106 | 108 | 108 | 107 |
| C | 106 | 107 | 109 | 110 | 109 |
| D | 108 | 106 | 107 | 107 | 106 |
| E | 105 | 105 | 107 | 107 | 107 |

US 6,946,149 B2

9

TABLE 4-continued

Serum Electrolyte and Mineral Data

| | 645 PM | 600 AM | 800 AM | 10 AM | 1200 PM |
|---|---|---|---|---|---|
| Bicarbonate (mEq/L) | | | | | |
| Phospho-Soda Experimental Solution | 23 | 23 | 21 | 22 | 23 |
| A | 21 | 23 | 23 | ND | ND |
| B | 20 | 21 | 19 | 21 | 20 |
| C | 23 | 22 | 22 | 22 | 23 |
| D | 24 | 23 | 21 | 21 | 21 |
| E | 23 | 24 | 23 | 22 | 23 |
| Sulfate (mEq/L) | | | | | |
| Phospho-Soda Experimental Solution | 1.63 | 1.68 | 1.52 | 1.75 | 1.70 |
| A | 1.16 | 1.79 | 1.84 | ND | ND |
| B | 1.92 | 1.75 | 1.83 | 1.58 | 1.83 |
| C | 1.38 | 1.86 | 1.54 | 1.70 | 1.78 |
| D | 0.88 | 1.30 | 1.62 | 1.46 | 1.30 |
| E | 1.36 | 1.85 | 2.01 | 1.87 | 1.62 |
| Phosphorous (mg/dL) | | | | | |
| Phospho-Soda Experimental Solution | 3.3 | 6.5 | 7.9 | 6.3 | 5.4 |
| A | 2.6 | 3.1 | 2.8 | ND | ND |
| B | 2.8 | 3.1 | 2.8 | 2.8 | 2.9 |
| C | 3.1 | 5.9 | 6.6 | 5.8 | 4.4 |
| D | 3.2 | 2.7 | 2.7 | 2.7 | 2.8 |
| E | 3.3 | 3.3 | 3.3 | 3.2 | 3.2 |
| Calcium (mg/dL) | | | | | |
| Phospho-Soda Experimental Solution | 9.2 | 9.1 | 8.9 | 9.0 | 9.1 |
| A | 9.2 | 9.3 | 9.5 | ND | ND |
| B | 9.4 | 9.6 | 9.4 | 9.5 | 9.5 |
| C | 9.4 | 9.3 | 9.3 | 9.2 | 9.5 |
| D | 8.9 | 9.1 | 8.8 | 9.0 | 8.7 |
| E | 9.3 | 9.5 | 9.7 | 9.6 | 9.6 |
| Ca × P | | | | | |
| Phospho-Soda Experimental Solution | 30.2 | 59.7 | 70.7 | 56.5 | 48.9 |
| A | 23.9 | 28.8 | 26.6 | ND | ND |
| B | 26.3 | 29.8 | 26.3 | 26.6 | 27.6 |
| C | 29.1 | 54.9 | 61.4 | 53.4 | 41.8 |
| D | 28.5 | 24.6 | 23.8 | 24.3 | 24.4 |
| E | 30.9 | 31.5 | 32.2 | 30.4 | 30.3 |
| Magnesium (mg/dL) | | | | | |
| Phospho-Soda Experimental Solution | 2.0 | 2.1 | 2.1 | 2.2 | 2.2 |
| A | 2.3 | 2.6 | 2.6 | ND | ND |
| B | 2.3 | 2.7 | 2.6 | 2.7 | 2.7 |
| C | 2.3 | 2.4 | 2.3 | 2.3 | 2.4 |
| D | 1.8 | 2.0 | 1.9 | 1.9 | 1.9 |
| E | 2.0 | 2.3 | 2.4 | 2.5 | 2.4 |
| Hematocrit | | | | | |
| Phospho-Soda Experimental Solution | 40.0 | 42.3 | 41.8 | 43.8 | 43.1 |
| A | 38.5 | 39.8 | 39.3 | ND | ND |
| B | 37.8 | 41.1 | 39.8 | 39.5 | 39.5 |
| C | 35.3 | 36.8 | 37.0 | 36.7 | 37.2 |
| D | 37.1 | 39.7 | 40.1 | 40.2 | 40.8 |
| E | 38.8 | 40.8 | 41.7 | 42.8 | 42.9 |

As indicated in table 3, stool volume averaged 2403 mL in three subjects who ingested the standard dose of Phospho-Soda. Table 4 shows that this was associated with a clinically

10

significant rise in serum phosphate, a clinically significant fall in serum calcium, a clinically significant rise in serum calcium×phosphate product (Ca×P), and a large net gastro intestinal potassium loss of 54 mEq. Serum potassium also fell, but generally stayed in the normal range. However, all subjects had a net negative balance in potassium. Serum phosphorus increased markedly, well outside of the normal range.

Solution A contained 100 mmoles of $Na_2SO_4$ and 100 mmoles of $MgSO_4$, as well as small amounts of KCl and $KHCO_3$ to replace anticipated K, Cl, and $HCO_3$ losses. After ingestion of solution A, stool (1500) was short of the Phospho-Soda output benchmark (2403 ml).

For solution B $K_2SO_4$ was substituted for KCl and $KHCO_3$; the $Na_2SO_4$ and $MgSO_4$ contents were each increased to 125 mmoles. Fecal output rose with solution B, to 2209 mL, but as shown in table 4 the potassium losses were unacceptably high.

The effect of adding phosphate salts was investigated in solution C which contained one half of the amount of phosphate in the Fleet Phospho-Soda protocol, and 142.5 mmoles of $Na_2SO_4$. This solution resulted in 1868 mL of fecal output. However, there was substantial net sodium absorption from this solution, and the serum Ca×P product increased dramatically due to absorbed phosphate. We therefore decided that phosphate should be excluded completely from further experimental solutions.

Solution D contained 142.5 mmoles of both $Na_2SO_4$ and $MgSO_4$, and 23.75 mmoles of $K_2SO_4$. This solution resulted in a stool volume of 2202 mL, which was slightly (180 mL) short of benchmark. Electrolyte changes were clinically insignificant with this formulation. A further increase in the ingested amounts of salts would likely be effective but, we were concerned about taste problems.

For solution E, PEG 3350 was added and the $K_2SO_4$ content reduced slightly as compared to solution D. In two subjects, solution E produced an average fecal output that slightly exceeded the Phospho-Soda benchmark, and the taste was acceptable. This solution caused no increase in Ca×P product, and its effect on potassium balance appeared to be close to zero. A small clinically insignificant change, was seen for magnesium, which stayed within the normal range of 1.4 to 3.1 mg/dL. Changes in sodium, chloride, sulfate and bicarbonate balance with this solution were considered to be of no clinical significance.

There are two ways to estimate the degree to which the poorly absorbable solutes were absorbed by the intestine. The first involves subtraction of fecal output from oral intake. This method assumes that anything not excreted in the stool by the end of the experiment was absorbed. Using this method, the absorption of phosphate after ingesting of Fleet Phospho-soda was 4.0 grams, or 38% of the ingested phosphate load.

The absorption of sulfate after ingestion of solution E was 165 mEq, or 27% of the ingested load. However, the serum sulfate concentration remained well below the level at which calcium sulfate precipitates form, therefore calcium levels remained unchanged. The absorption of magnesium after ingestion of solution E was 66 mEq, or 23% of the ingested load. The second method that can be used involves changes in urine output of the solutes. When a phosphate-free solution was ingested (solution E), urine phosphate excretion was 0.4 g, whereas when 10.6 g of phosphate were ingested (Fleet Phospho-Soda), urine phosphate excretion was 2.1 g (=1.7 g); thus, 16% of the ingested phosphate appeared in the collected urine. By a similar calculation,

**A00000036**

US 6,946,149 B2

**11**

10% of ingested sulfate and 2% of ingested magnesium appeared in the collected urine. By both methods, the intestinal absorption of the ingested electrolytes occurred in the following order of magnitude: P>SO$_4$>Mg.

The volume of fecal fluid output, the quality of colonic cleansing, side effects, and weight loss were similar with Fleet Phospo-Soda and Solutions D and E. Both solutions were unpleasant to ingest, but neither had a bad aftertaste. The highest observed Ca×P product varied from 62 to 76 with Phospho-Soda which is well in excess of the level at which calcium-phosphate precipitates form. For solution E Ca×P was from 30 to 37. The Phospho-Soda preparation caused a net gastrointestinal loss of 54 mEq of potassium, whereas solutions D and E caused essentially no loss or gain of potassium.

The serum phosphate concentration increased more than 2-fold after ingestion of Phospho-Soda, whereas the serum sulfate concentration rose only slightly after ingestion of solution E. There were no significant changes in serum magnesium concentration.

Solution E contains three sulfate salts (Na$_2$SO$_4$, K$_2$SO$_4$ and MgSO$_4$) as well as polyethylene glycol. Sulfate, magnesium and polyethylene glycol are poorly absorbed, and ingestion of this solution therefore induces osmotic diarrhea. The sodium content of solution E is less than the sodium content of Phospho-Soda, and solution E contains potassium whereas Phospho-Soda does not. Solution E and Fleet Phospho-Soda appear to provide equivalent colonic cleansing. However, in contrast to Phospho-Soda, solution E does not cause serum phosphate concentration to rise and does not cause a net gastrointestinal loss of potassium.

Both solutions were associated with approximately 2.5 kg loss in body weight which can be explained by higher water output (in both stool and in urine) than water intake by mouth. To prevent this weight loss, the subjects would need to ingest an additional 2.5 kg of water, which would increase total water intake to approximately 4 liters. This might be advisable for protection of body fluid volume, but it might make the method of cleansing less attractive and less convenient. There were no changes in the vital signs of our subjects, indicating that the observed body water losses caused by ingestion of the two solutions are well tolerated by normal people.

The Phopho-Soda phosphate solution and solutions D and E produce similar volumes of osmotic diarrhea, and the quality of colon cleansing (as judged by examination of fecal fluid) with the two solutions were similar. Presumably, both solutions will be associated with some residual colonic fluid, which is not a problem during colonoscopy since such fluid is readily aspirated via the suction lumen of the colonoscope. However, for virtual colonoscopy it is desirable that the colon be dry, and to this end of Ducolax suppository is often employed shortly before CT scanning is performed.

The foregoing description is illustrative of the preferred embodiments shown. It is not intended to limit the present invention to the specific formulations shown and described, but instead it will be appreciated that adaptations and modifications will become apparent from the present disclosure and are intended to be within the scope of the claims. For example, small amounts of sodium chloride, potassium chloride and or bicarbonate may be added to consider patient needs.

What is claimed is:

1. A composition for inducing purgation of the colon of a patient, the composition comprising a small volume of an aqueous hypertonic solution which comprises an effective

**12**

amount of one or more salts selected from the group consisting of Na$_2$SO$_4$, MgSO$_4$, and K$_2$SO$_4$, and an effective amount of PEG, wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.

2. A composition according to claim 1, wherein the solution comprises an effective amount of Na$_2$SO$_4$, an effective amount of MgSO$_4$, an effective amount of K$_2$SO$_4$, and an effective amount of PEG.

3. A composition according to claim 2, wherein the solution comprises between about 2 grams and about 40 grams of Na$_2$SO$_4$, between about 2 grams and about 20 grams of MgSO$_4$, between about 1 gram and about 10 grams of K$_2$SO$_4$, and between about 0.1 gram and about 50 grams of PEG.

4. A composition for inducing purgation of the colon of a patient according to claim 1, wherein the solution comprises about 20 grams of Na$_2$SO$_4$, about 20 grams of MgSO$_4$, about 3 grams of K$_2$SO$_4$, and about 34 grams of PEG.

5. A composition for inducing purgation of the colon of a patient according to claim 4, wherein the solution has a volume of less than 500 ml.

6. A composition for inducing purgation of the colon of a patient, comprising a small volume of an aqueous hypertonic solution consisting essentially of an effective amount of one or more salts selected from the group consisting of Na$_2$SO$_4$, MgSO$_4$, and K$_2$SO$_4$, and an effective amount of PEG, wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.

7. A composition for inducing purgation of the colon of a patient according to claim 6, wherein the solution consists essentially of about 20 grams of Na$_2$SO$_4$, about 20 grams of MgSO$_4$, about 3 grams of K$_2$SO$_4$, and about 34 grams of PEG in about 330 ml of water.

8. A composition according to claim 1, wherein the solution is from about 100 ml to about 500 ml in volume.

9. A composition according to claim 1, wherein the solution comprises an effective amount of two or more salts selected from the group consisting of Na$_2$SO$_4$, MgSO$_4$, and K$_2$SO$_4$, and an effective amount of PEG.

10. A method for inducing colonic purgation in a patient, comprising the steps of:

(a) orally administering an effective amount of the composition of claim 1 to a patient; and

(b) allowing the administered composition to induce colonic purgation.

11. A method for inducing colonic purgation according to claim 10, wherein the solution consists essentially of about 20 grams of Na$_2$SO$_4$, about 20 grams of MgSO$_4$, about 3 grams of K$_2$SO$_4$, and about 34 grams of PEG in about 330 ml of water.

12. A method for inducing colonic purgation in a patient according to claim 10, wherein the effective amount of the composition is administered in two or more doses within a treatment period.

13. The method of claim 10, wherein about 100 ml to about 500 ml of the solution is administered to the patient.

14. The method of claim 10, wherein the solution comprises an effective amount of two or more salts selected from group consisting of Na$_2$SO$_4$, MgSO$_4$, and K$_2$SO$_4$, and an effective amount of PEG.

15. A composition for inducing purgation of the colon of a patient, the composition comprising a small volume of an aqueous hypertonic solution comprising an effective amount of Na$_2$SO$_4$, an effective amount of MgSO$_4$, and an effective amount of K$_2$SO$_4$, wherein the composition does not pro-

US 6,946,149 B2

13

duce any clinically significant electrolyte shifts and does not include phosphate.

**16**. A composition according to claim **15**, wherein the solution comprises between about 2 grams and about 40 grams of $Na_2SO_4$, between about 2 grams and about 20 grams of $MgSO_4$, and between about 1 gram and about 10 grams of $K_2SO_4$.

**17**. A composition according to claim **15**, wherein the solution is from about 100 ml to about 500 ml in volume.

**18**. A composition for inducing purgation of the colon of a patient comprising a small volume of an aqueous hypertonic solution consisting essentially of an effective amount of $Na_2SO_4$, an effective amount of $MgSO_4$, and an effective amount of $K_2SO_4$, wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.

**19**. A method for inducing colonic purgation in a patient, comprising the steps of:

(a) orally administering an effective amount of the composition of claim **18** to a patient; and

14

(b) allowing the administered composition to induce colonic purgation.

**20**. A method for inducing colonic purgation in a patient, comprising the steps of:

(a) orally administering an effective amount of the composition of claim **15** to a patient; and

(b) allowing the administered composition to induce colonic purgation.

**21**. The method of claim **20**, wherein about 100 ml to about 500 ml of the solution is administered to the patient.

**22**. A method for inducing colonic purgation according to claim **20**, wherein the solution consists essentially of about 20 grams of $Na_2SO_4$, about 20 grams of $MgSO_4$, and about 3 grams of $K_2SO_4$.

**23**. A method for inducing colonic purgation in a patient according to claim **20**, wherein the effective amount of the composition is administered in two or more doses within a treatment period.

\*   \*   \*   \*   \*

A00000038

US006946149C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (6907th)

## United States Patent
### Cleveland

(10) **Number:**          **US 6,946,149 C1**
(45) **Certificate Issued:**          **Jun. 30, 2009**

(54) **SALT SOLUTION FOR COLON CLEANSING**

(75) Inventor: **Mark vB. Cleveland**, Duxbury, MA (US)

(73) Assignee: **Braintree Laboratories, Inc.**, Braintree, MA (US)

**Reexamination Request:**
No. 90/010,316, Oct. 15, 2008

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,946,149** |
| Issued: | **Sep. 20, 2005** |
| Appl. No.: | **10/135,857** |
| Filed: | **Apr. 30, 2002** |

(51) **Int. Cl.**
*A61K 31/765* (2006.01)
*A61K 31/77* (2006.01)
*A61K 31/74* (2006.01)
*A61K 33/06* (2006.01)

(52) **U.S. Cl.** ....................... **424/709**; 424/713; 514/723; 514/738; 514/892

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0298655 | 1/1989 |
| EP | 0396165 A1 * | 7/1990 |
| EP | 0900562 A1 * | 10/1999 |
| WO | WO/00/44240 A1 * | 9/2000 |

OTHER PUBLICATIONS

Abstract to JP 01132527A issued to Morishita on May 25, 1989.*

Parfitt, K., Editor. "Martindale. The Complete Drug Reference" 32nd Edition, 2000. pp. 1157–1159, 1161–1162, 1213–1215, and 1597–1598.*

* cited by examiner

*Primary Examiner*—Dwayne C Jones

(57)          **ABSTRACT**

The field of colonic diagnostic and surgical procedures is hampered by the lack of optimal means available to cleanse the colon. A compromise between convenient, distasteful, solid or low volume, hyperosmotic solutions which cause considerable fluid and electrolyte imbalances in patients and large volume, difficult to consume, iso-osmotic solutions has had to be made heretofore. This invention describes a low volume, hyper-osmotic solution consisting of sulfate salts with and with out polyethylene glycol. Unlike prior art, this composition is useful for the cleansing of the bowel and, in lower volumes, as a laxative, without producing clinically significant changes in bodily function.

US 6,946,149 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims 1, 6, 8, 9, 13, 14, 17 and 21 are cancelled.

Claims 2–4, 7, 10, 15 and 18 are determined to be patentable as amended.

Claims 5, 11, 12, 16, 19, 20, 22 and 23, dependent on an amended claim, are determined to be patentable.

2. A composition [according to claim 1] *for inducing purgation of the colon of a patient, the composition comprising from about 100 ml to about 500 ml of an aqueous hypertonic solution,* wherein the solution comprises an effective amount of $Na_2SO_4$, an effective amount of $MgSO_4$, an effective amount of $K_2SO_4$, and an effective amount of PEG, *wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.*

3. A composition according to claim [1 ] *2,* wherein the solution comprises between about 2 grams and about 40 grams of $Na_2SO_4$, between about 2 grams and about 20 grams of $MgSO_4$, between about 1 gram and about 10 grams of $K_2SO_4$, and between about 0.1 gram and about 50 grams of PEG.

**2**

4. A composition for inducing purgation of the colon of a patient according to claim [1] *2,* wherein the solution comprises about 20 grams of $Na_2SO_4$, about 20 grams of $MgSO_4$, about 3 grams of $K_2SO_4$, and about 34 grams of PEG.

7. A composition for inducing purgation of the colon of a patient [according to claim 6], *comprising from about 100 ml to about 500 ml of an aqueous hypertonic solution,* [wherein the solution consists] *consisting* essentially of about 20 grams of $Na_2SO_4$, about 20 grams of $MgSO_4$, about 3 grams of $K_2SO_4$, and about 34 grams of PEG [in about 330 ml of water] *wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.*

10. A method for inducing colonic purgation in a patient, comprising the steps of:

(a) orally administering an effective amount of the composition of claim [1] *2* to a patient; and

(b) allowing the administered composition to induce colonic purgation.

15. A composition for inducing purgation of the colon of a patient, the composition comprising [a small volume] *from about 100 ml to about 500 ml* of an aqueous hypertonic solution comprising an effective amount of $Na_2SO_4$, an effective amount of $MgSO_4$, and an effective amount of $K_2SO_4$, wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.

18. A composition for inducing purgation of the colon of a patient, comprising [a small volume] *from about 100 ml to about 500 ml* of an aqueous hypertonic solution consisting essentially of an effective amount of $Na_2SO_4$, an effective amount of $MgSO_4$, and an effective amount of $K_2SO_4$, wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.

* * * * *

**A00000040**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 6,946,149 B2                                    Page 1 of 1
APPLICATION NO. : 10/135857
DATED              : September 20, 2005
INVENTOR(S)      : Mark vB. Cleveland et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page, Item (75) Inventors: should read: -- **Mark vB. Cleveland**, Duxbury, MA (US)
                                                  **John S. Fordtran**, Dallas, TX (US) --

Signed and Sealed this

Ninth Day of February, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

**A00000040.1**

## CERTIFICATE OF SERVICE

I, H. Keeto Sabharwal, hereby certify that a copy of **PRINCIPAL BRIEF FOR APPELLANT NOVEL LABORATORIES, INC.** and **ADDENDUM** to same was served by electronic mail and the CM/ECF system, addressed to:

John Joseph Regan, Jr.
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: 617.526.6120
Fax: 617.526.5000
John.Regan@wilmerhale.com

Christopher R. Noyes
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: 212.295.6823
Fax: 212-230-8888
christopher.noyes@wilmerhale.com

Mark Christopher Fleming
Michael Adam Greene
Anna E. Lumelsky
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: 617.526.6731
Fax: 617.526.5000
mark.fleming@wilmerhale.com
michael.greene@wilmerhale.com
anna.lumelsky@wilmerhale.com

*Attorneys for Plaintiff-Appellee, Braintree Laboratories, Inc.*

Dated: September 9, 2015

 /s/ H. Keeto Sabharwal
H. Keeto Sabharwal
Byron L. Pickard
Nirav N. Desai
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600

*Counsel for Defendant-Appellant Novel Laboratories, Inc.*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 10,860 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 in 14 point Times New Roman.

/s/ H. Keeto Sabharwal
H. Keeto Sabharwal
Counsel for Defendant-Appellant
September 9, 2015